Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pablo Méndez Acevedo Monserrate Acevedo Feliciano y La Sociedad Legal de Gananciales Compuesta por ambos | Certiorari |
| Demandantes-Peticionarios | 2010 TSPR 105 |
| v. | 179 DPR ____ |
| Héctor Juan Nieves Rivera, et als | |
| Demandados-Recurridos | |

Número del Caso: CC-2006-143

Fecha: 22 de junio de 2010

Tribunal de Apelaciones:

Región Judicial de Aguadilla

Juez Ponente:       Hon. Roberto Córdova Arone

Abogado de la Parte Peticionaria:

Lcdo. Ramiro Llado Martínez

Materia: Revisión de Sentencia

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pablo Méndez Acevedo,
Monserrate Acevedo Feliciano y
la Sociedad Legal de
Gananciales compuesta por                                    *Certiorari*
ambos

    Demandantes-Peticionarios     CC-2006-0143

          v.

Héctor Juan Nieves Rivera, et
als

    Demandados-Recurridos

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco

En San Juan, Puerto Rico a 22 de junio de 2010.

El *quid* que nos plantea el presente recurso es si son los árbitros o los jueces los llamados a adjudicar una controversia en la que se impugna la existencia y la validez de un contrato, *in toto*, cuando dicho contrato tiene una Cláusula de Arbitraje que es amplia. A su vez, tenemos la oportunidad de determinar, si debemos adoptar en nuestra jurisdicción la doctrina de separabilidad, que propugna que las Cláusulas de Arbitraje son separables (*severable*) e independientes del contrato principal. A continuación, expondremos los hechos que dieron génesis a la controversia que hoy tenemos ante nuestra consideración.

**I.**

El 29 de julio de 2004, los peticionarios Pablo Méndez Acevedo, Monserrate Acevedo Feliciano y la Sociedad de Bienes Gananciales por ellos compuesta, incoaron una Demanda sobre sentencia declaratoria, *injunction*, y cobro de dinero en contra de los recurridos Héctor Juan Nieves Rivera y José Luis Pérez Hidalgo, sus esposas y sus respectivas Sociedades de Bienes Gananciales. Surge de la Demanda incoada que los peticionarios y los recurridos suscribieron ante un notario un Contrato Privado de Constitución de Sociedad Regular Colectiva, en adelante Contrato de Sociedad. La razón y objeto de dicha sociedad, que vino a conocerse como Auto Export era la compra y venta de vehículos de motor, importados y locales.[1]

Los peticionarios alegaron en la Demanda, *inter alia*, que el Contrato de Sociedad era nulo por deficiencias de forma y sustantivas por lo cual la relación existente entre las partes era la de compartir gastos comunes en una proporción de una tercera parte para cada una de las partes en el Contrato. Además, sostuvieron que los recurridos le debían toda la documentación relacionada a la adquisición de varios vehículos de motor que hicieran los peticionarios por lo cual solicitaron un *injunction* para que el tribunal ordenara dicha entrega.[2] Adujeron,

---

[1] Véase, Exhibit D de la Petición de *Certiorari* presentado por la parte peticionaria, *Contrato Privado de Constitución de Sociedad Regular Colectiva*, pág. 122.

[2] Según los hechos alegados en la Demanda, los peticionarios compraron varios vehículos de motor (entre las marcas se encontraban, Toyota,

también, que los recurridos les debían la cantidad de dos mil seiscientos sesenta y seis dólares con sesenta y seis centavos ($2,666.66) por concepto de cánones de arrendamiento por lo cual peticionaron del tribunal que ordenara el desahucio y desalojo de éstos, incluyendo el pago de los cánones adeudados.[3] Asimismo, arguyeron que los recurridos les adeudaban la suma de diez mil novecientos ochenta y seis dólares con sesenta y seis centavos ($10,986.66) por concepto del pago de varios préstamos que los peticionarios le confirieron.[4]

Así las cosas, y luego de varios trámites procesales, los recurridos presentaron una moción solicitando arbitraje, en la cual expusieron que, de la Décimo Cuarta Cláusula del Contrato de Sociedad (Cláusula de Arbitraje), surgía palmariamente que el caso debía dilucidarse mediante un proceso de arbitraje y no ante el foro de instancia. Por tal razón, le peticionaron al foro *a quo* que declarara con lugar la moción. *A contrario sensu*, la parte peticionaria replicó, aduciendo en esencia, que el Contrato de Sociedad en cuestión era uno mercantil y que

---

Honda, Mercury y Ford) que fueron sufragados exclusivamente por éstos, incluyendo entre los gastos: el precio de compraventa, el pago del acarreo marítimo, el pago de los arbitrios de los vehículos. Posteriormente, los peticionarios vendieron dichos vehículos a Sánchez Import Cars, Inc., por razón de desavenencias habidas entre las partes en controversia. Sin embargo, la transacción de compraventa no se ha finiquitado porque la parte recurrida no le ha hecho entrega a los peticionarios de documentación necesaria que incluye el recibo de pago de los arbitrios y el título de propiedad de los vehículos.

[3] La propiedad objeto de alquiler fue comprada por los peticionarios y en ella ubica Auto Export.

[4] Véase, Exhibit D de la Petición de *Certiorari* presentada por la parte peticionaria, *Demanda*, págs. 21-31.

por tal razón debían cumplirse ciertas formalidades omitidas que hacían nulo el mismo, siendo la más importante, que el Contrato de Sociedad constara en escritura pública. Así, arguyó que por ser nulo el Contrato de Sociedad, la Cláusula de Arbitraje no se podía ejecutar.

El 8 de agosto de 2004 el Tribunal de Primera Instancia emitió una Sentencia en la que sostuvo que las partes habían suscrito un Contrato de Sociedad Regular Colectiva en el cual incluyeron una Cláusula de Arbitraje "explícitamente abarcadora". Resolvió que dicha cláusula era ejecutable por lo que le correspondía a un árbitro atender la controversia sobre la nulidad del Contrato de Sociedad. Así, ordenó a las partes someterse al proceso de arbitraje estipulado en el contrato para que dilucidaran sus reclamos por medio de ese mecanismo alterno de solución de disputas.

No contestes con tal determinación, la parte recurrida fue en alzada ante el Tribunal de Apelaciones. Dicho foro apelativo intermedio confirmó al foro de instancia pero por otros fundamentos. El Tribunal de Apelaciones centró el análisis de la controversia en el Contrato de Sociedad. De esa manera, se enfocó en resolver si era o no válido en su totalidad el referido Contrato de Sociedad. Dicho foro sostuvo que el Contrato de Sociedad

era válido aun cuando no constaba en escritura pública.[5] Resolvió por tanto, que al ser válido el Contrato de Sociedad, también era válida la Cláusula de Arbitraje allí subsumida. Por tal razón, le ordenó a las partes acudir al proceso de arbitraje.

Inconforme con ese dictamen, la parte peticionaria acude ante nos mediante el recurso de *certiorari*. Sostiene que tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones erraron al no declarar la nulidad del Contrato de Sociedad Regular Colectiva, esto debido a que no estaba constituido en escritura pública. Aduce también, que ambos foros incidieron al no declarar que la Cláusula de Arbitraje suscrita en dicho Contrato de Sociedad es nula por ser parte de un contrato nulo.

*Ab interim*, la parte peticionaria presentó ante nos una moción intitulada "Moción Informando Nueva Jurisprudencia del Tribunal Supremo de los Estados Unidos que podría impactar el Caso de Epígrafe". En efecto, la propia parte peticionaria alega que en el caso de *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *infra*, el Tribunal Supremo de los Estados Unidos resolvió, que los asuntos relacionados a la validez de un contrato principal, donde se encuentra una Cláusula de Arbitraje amplia,  debe ser

---

[5] El Tribunal de Apelaciones concluyó que el Contrato de Sociedad era válido y que no tenía que constar en escritura pública. Señaló, que con independencia de si el contrato era o no uno de naturaleza mercantil ‑‑como alegaban los peticionarios‑‑, ni el Código de Comercio ni el Código Civil de Puerto Rico exigen que el contrato celebrado entre las partes conste en escritura pública. Véase, Exhibit A de la Petición de *Certiorari* presentado por la parte peticionaria, *Sentencia del Tribunal de Apelaciones*, págs. 1-13.

adjudicado por los árbitros y no por los tribunales. Sin embargo, la parte peticionaria entiende que ese precedente no es aplicable al caso de autos por tratarse aquí de un asunto concerniente a la existencia y no a la validez del Contrato de Sociedad.

Vista la petición de *certiorari*, acordamos expedir. Con el beneficio de la comparecencia de las partes, procedemos a resolver sin ulterior trámite.

## II.

## A.

Para abordar la controversia planteada, comenzaremos exponiendo la normativa que rige el arbitraje comercial en Puerto Rico.

Nuestro ordenamiento jurídico hace asequible que las partes en un contrato se obliguen a llevar ante un árbitro, mediante un procedimiento de arbitraje, las posibles controversias futuras relacionadas con su contrato. Esa facultad surge principalmente de la Ley Núm. 376 de 8 de mayo de 1951, según enmendada, conocida como Ley de Arbitraje de Puerto Rico, 32 L.P.R.A. sec. 3201. Así, el Art. 1 de la mencionada ley establece que las partes "podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en relación con el mismo.[6] *Íd.;*

---

[6] Como afirma el Profesor David M. Helfeld, no cabe duda que el lenguaje del mencionado artículo permite una interpretación amplia en torno a las controversias que puedan someterse al procedimiento de

*Municipio Mayagüez v. Lebrón*, 167 D.P.R. 713, 720 (2006);
*Crufon Const. v. Aut. Edif. Púbs.*, 156 D.P.R. 197, 204
(2002). "Tal convenio será válido, exigible e irrevocable
salvo por los fundamentos que existieran en derecho para
la revocación de cualquier convenio". Ley Núm. 376, *supra*.

Por tal razón, el arbitraje es una figura jurídica
inherentemente contractual. *Municipio Mayagüez v. Lebrón*,
*supra*; *U.C.P.R. v. Triangle Engineering Corp.*, 136 D.P.R.
133, 144 (1994); *Rivera v. Samaritano & Co.*, 108 D.P.R.
604, 606-607 (1979). Así, por su naturaleza convencional,
se puede exigir únicamente cuando se ha pactado y cuando
se haya hecho constar por escrito. Art. 1 de la Ley Núm.
376, *supra*; *Crufon Const. v. Aut. Edif. Púbs.*, *supra*, pág.
204; *Municipio de Ponce v. Gobernador*, 136 D.P.R. 776, 783
(1994).[7]

En ese sentido, una de las controversias que las
partes tienen derecho a dirimir ante los tribunales, es
aquella relacionada a la obligación de arbitrar. Artículo
4 de la Ley Núm. 376, 32 L.P.R.A. sec. 3204; *Municipio*

---

arbitraje en Puerto Rico. D.M. Helfeld, *La Jurisprudencia Creadora: Factor Determinante en el Desarrollo de Arbitraje en Puerto Rico*, 70 Rev.Jur. U.P.R. 1, 20 (2001).

[7] En Opinión emitida por el Secretario de Justicia, éste acotó que: "el procedimiento de arbitraje que contempla la Ley Núm. 376 es de carácter contractual y extrajudicial, rigiéndose el mismo por el convenio que adopten las partes contratantes, el que se considera válido, exigible e irrevocable; y que sólo procede la intervención judicial para el nombramiento de árbitros, de así solicitarlo las partes del convenio y en los casos taxativos dispuestos por ley". Op. Sec. Just. Núm. 1973-4, 12 de febrero de 1973, pág. 23. Este Tribunal ha reconocido el valor persuasivo de las Opiniones del Secretario de Justicia. *P.P.D. v. Gobernador I*, 139 D.P.R. 643, 687 n.23 (1995); *Col. Int'l Sek P.R., Inc. v. Escribá*, 135 D.P.R. 647, 663 n.19 (1994).

*Mayagüez v. Lebrón*, *supra*. Por tal, "la determinación de si un acuerdo crea el deber de las partes de arbitrar una controversia en particular es tarea judicial". *World Films, Inc. v. Paramount Pictures Corp.*, *supra*, pág. 361. Sobre ese particular, este Foro ha expuesto, citando a *National R.R. Passenger Corp. v. Boston S. Maine Corp.*, 850 F.2d 756 (D.C. Cir. 1988), que tal controversia comporta tres (3) modalidades, a saber: i) si existe un convenio de arbitraje; ii) si tal convenio alcanza determinada controversia; iii) y si tal convenio alcanza una disputa sobre la duración o expiración del contrato. *Municipio Mayagüez v. Lebrón*, *supra*, pág. 720-721; *U.C.P.R. v. Triangle Engineering Corp.*, *supra*, pág. 144; *World Films v. Paramount Pictures Corp.*, *supra*, pág. 361 n. 9 (1990).

Por otra parte, este Tribunal ha sido consistente al exteriorizar de manera enfática, que en Puerto Rico existe una fuerte política pública a favor del arbitraje,[8] y que toda duda que pueda existir sobre si procede o no el arbitraje, debe resolverse a favor de éste. *U.C.P.R. v. Triangle Engineering Corp.*, *supra*, págs. 141-142, 143; *Quiñones v. Asociación*, 161 D.P.R. 668, 673 (2004); *PaineWebber v. Soc. de Gananciales*, 151 D.P.R. 307, 312-313 (2000); *McGregor-Doniger, Inc. v. Tribunal Superior*,

---

[8] Por supuesto, aunque la política a favor del arbitraje en Puerto Rico es acuciante, ésta no es omnímoda. Esa política pública no representa una política de orden absoluto ante la cual tenga que doblegarse por fuerza toda otra política pública. *Walborg Corp. v. Tribunal Superior*, 104 D.P.R. 184, 187 (1975).

98 D.P.R. 864, 869 (1970). *A fortiori*, este Foro ha afirmado que "ante un convenio de arbitraje lo prudencial es la abstención judicial, aunque esa intervención no esté vedada". *Municipio Mayagüez v. Lebrón*, *supra*, pág. 721; *U.C.P.R. v. Triangle Engineering Corp.*, *supra*, pág. 142. Por eso, una vez acordado el arbitraje, los tribunales carecen de discreción respecto a su eficacia y tienen que dar cumplimiento al arbitraje acordado. *Municipio Mayagüez v. Lebrón*, *supra*, pág. 721; *Moses H. Cone Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

Empero, aunque en Puerto Rico existe una política vigorosa que favorece el arbitraje de controversias, este mecanismo se utilizará sólo si las partes así lo han pactado y en la forma en que lo han pactado. *Crufon Const. v. Aut. Edif. Púbs.*, *supra*, pág. 205. Esto se debe a que como el arbitraje es una figura de naturaleza contractual, no se puede obligar a una parte a someter una disputa al procedimiento de arbitraje si esa parte no lo ha pactado de esa forma. *Íd*; *Municipio de Ponce v. Gobernador*, *supra*, pág. 783 n. 1.

**B.**

Por otro lado, debemos apuntar que la Ley Núm. 376, *supra*, fue diseñada y forjada, en gran parte, cual reflejo de la Ley Federal de Arbitraje, 9 U.S.C.A. sec. 1, *et seq.* Véase, D. Helfeld, *supra*, págs. 12, 20.[9] Por tal razón, la

---

[9] Como afirma el Profesor David Helfeld, la Ley Núm. 376, *supra*, fue redactada utilizando la Ley Federal de Arbitraje, *supra*, como modelo. "Gran parte de sus disposiciones, especialmente las que son claves,

Ley Núm. 376, *supra*, sigue sustancialmente el modelo de la Ley Federal de Arbitraje, *supra*. De ahí, que la jurisprudencia interpretativa de la ley federal, nos sirve de guía en la disposición de los casos en la jurisdicción local. Véanse, *Municipio Mayagüez v. Lebrón*, *supra*, pág. 721; *Autoridad sobre Hogares v. Tribunal Superior*, 82 D.P.R. 344, 359 (1961).[10]

En efecto, nuestra normativa en materia de arbitraje comercial, se ha desarrollado bajo el crisol de la jurisprudencia exegética de la Ley Federal de Arbitraje, *supra*. Así por ejemplo, nuestra política pública a favor del mecanismo del arbitraje, fue predicada inicialmente por la jurisprudencia federal al interpretar el estatuto federal de arbitraje. *PaineWebber v. Soc. de Gananciales*, *supra*, pág. 311; *Medina v. Cruz Azul de Puerto Rico*, 155 D.P.R. 735, 742 (2001).[11] Véase, *Byrd v. Dean Witter*

---

constituyen una traducción de la F.A.A. [*Federal Arbitration Act*] al español". D. Helfeld, *supra*, pág. 20.

[10] En *Municipio Mayagüez v. Lebrón*, *supra*, con relación a las Cláusulas de Arbitraje en el ámbito de los contratos de construcción comercial, expresamos que: "las cláusulas de arbitraje no precisan un consentimiento específico, sino que pueden incorporarse mediante referencia en el contrato principal. Se ha entendido así en la mayoría de las jurisdicciones estadounidenses, a cuya jurisprudencia acudimos por ser nuestra Ley de Arbitraje una criatura del derecho norteamericano". Por su parte, en *Autoridad sobre Hogares v. Tribunal Superior*, señalamos que:

> La Ley 376 autoriza y regula de manera comprensiva el convenio de arbitraje comercial y dispone la forma de hacer cumplir dichos convenios por las cortes... El estatuto está calcado sustancialmente en disposiciones de la legislación sobre arbitraje de California y leyes similares de otros estados, en los procedimientos de Nueva York y en la Ley de Arbitraje de Estados Unidos.

[11] La legislación federal nace como respuesta a la antigua actitud hostil, heredada de la tradición anglosajona, que algunos tribunales estatales tenían para con dichas Cláusulas de Arbitraje. *Circuit City Stores v. Adams*, 532 U.S. 105, 111 (2001). A través de la Ley de

*Reynolds, Inc.*, 470 U.S. 213, 217 (1985). Igualmente, este Tribunal, ha adoptado los principios hermenéuticos que ha desarrollado el Tribunal Supremo en materia de arbitraje. Así, este Foro, citando al Tribunal Supremo Federal, ha sostenido que cualquier duda que exista sobre el alcance de las controversias que pueden ser llevadas a arbitraje, debe resolverse a favor de dicho mecanismo. *PaineWebber v. Soc. de Gananciales*, *supra*, pág. 312; *U.C.P.R. v. Triangle Engineering Corp.*, *supra*, págs. 141, 143; *McGregor-Doniger v. Tribunal Superior*, *supra*, pág. 869.; *Perry v. Thomas*, 482 U.S. 483, 493 n. 9 (1987). *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985); *Galt v. Libbey Owens Ford Glass Co.*, 376 F.2d 711, 714 (7mo Cir. 1967). Por eso, es innegable que existe una gran convergencia entre lo dispuesto por el Tribunal Supremo Federal y este Tribunal en materia de arbitraje comercial.

De otra parte, cabe añadir, que la Ley Federal de Arbitraje, *supra*, aplica tanto a los tribunales federales como a los estatales y requiere que éstos hagan cumplir los Contratos de Arbitraje acordados por las partes como cualquier otro convenio. *PaineWebber v. Soc. de Gananciales*, *supra*, pág. 312, *World Films, Inc. v. Paramount Pictures Corp.*, *supra*, págs. 357-358; *Southland*

---

Arbitraje Federal, el Congreso se aseguró de que las "cláusulas de arbitraje fueran evaluadas y validadas como cualquier otra cláusula contractual, teniendo en cuenta la autonomía contractual de las partes, e instituyendo así una vigorosa política pública nacional a favor del arbitraje". *Medina v. Cruz Azul de Puerto Rico*, *supra*. pág. 742.

*Corp. v. Keating*, 465 U.S. 1, 16 (1984)[12]. Sin embargo, la aplicación estatal del mencionado estatuto, se limita únicamente a los contratos en el comercio interestatal. *Municipio Mayagüez v. Lebrón*, *supra*, pág. 721 n. 7; *Medina v. Cruz Azul de Puerto Rico*, *supra*, pág. 742. Esto se debe a que la Ley de Arbitraje Federal fue promulgada por el Congreso bajo el palio de la Cláusula de Comercio, por lo que sus disposiciones se activan solamente, cuando las partes alegan y prueban que la transacción envuelta en la controversia formó parte del comercio interestatal. *Medina v. Cruz Azul de Puerto Rico*, *supra*, pág. 742; *Allied-Bruce Terminix Cos. V. Dobson*, 513 U.S. 265, 273-274 (1995); *Perry v. Thomas*, *supra*, pág. 490. Es decir, bajo esas circunstancias, como regla general, el campo estará ocupado por la Ley Federal de Arbitraje.[13] *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 684-685 (1996); *Allied-Bruce Terminix Cos. v. Dobson*, *supra*, pág. 272.

---

[12] En este caso, el Tribunal Supremo de los Estados Unidos resolvió expresamente que la Ley Federal de Arbitraje, *supra*, aplica tanto en los tribunales federales como en los estatales: "In creating a substantive rule applicable in state as well as federal courts, Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements". *Southland Corp. v. Keating*, *supra*, pág. 16. Véase, M. Domke, *Domke on Commercial Arbitration*, 3ra ed., Ed. Thomson Reuters/West, 2009, Vol. I, Sec. 7:6, págs. 19-20.

[13] Sin embargo, la Ley Federal de Arbitraje, *supra*, requiere que los tribunales hagan valer las Cláusulas de Arbitraje según sus propios términos. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995); *Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University*, 489 U.S. 468, 472-479 (1989). Por lo tanto, cuando un pacto de arbitraje establece que se habrá de regir por la ley de un estado, dicha ley podrá aplicarse tal y como se pactó en el contrato aunque el contrato sea uno en el comercio interestatal. *Medina v. Cruz Azul de Puerto Rico*, *supra*, pág. 743, n.3. Véase, M. Domke, *op. cit.*, sec. 7:7, págs. 34-35.

*A priori*, de lo antes expuesto podemos colegir lo siguiente: i) la normativa desarrollada en nuestra jurisdicción, con relación al arbitraje comercial, tiene sus cimientos en la Ley Federal de Arbitraje, *supra*, y su jurisprudencia interpretativa; y ii) aunque la Ley Federal de Arbitraje, *supra*, ocupa el campo en cuanto al comercio interestatal, en el caso de autos, la parte peticionaria en ningún momento ha alegado y probado que el Contrato de Sociedad suscrito y convenido entre ella y la parte recurrida, forma parte del comercio interestatal. Por tal razón, no estamos, *stricto sensu*, atados a lo pautado por el Tribunal Supremo Federal al interpretar la Ley Federal de Arbitraje, *supra*. Empero, no podemos abstraernos del hecho irrefutable, de que tanto nuestra Ley de Arbitraje Comercial, *supra*, como la casuística que se ha ido destilando de ésta, han sido teñidas a la luz de la Ley de Arbitraje Federal, *supra*, y los precedentes que ésta ha generado. En ese sentido, la no aplicabilidad de la Ley Federal de Arbitraje, *supra*, al caso de autos, no connota que tengamos que trazar una ruta heterogénea a la seguida por el Tribunal Supremo Federal, y mucho menos, que estemos impedidos de atisbar lo resuelto por los tribunales estatales que comparten nuestra política arbitral, a la hora de solucionar la controversia aquí trabada.[14]

---

[14] Véase, *Easterling v. Royal Manufactured Hous., LLC*, 963 SO.2d 399 (Louisiana, 2007). Allí, el Tribunal del Tercer Circuito de

## III.

En ocasión anterior, este Tribunal resolvió que una acción en la que se impugne la existencia de un contrato, puede dilucidarse en un proceso de arbitraje cuando la Cláusula Arbitral es suficientemente amplia:

> [C]uando la cláusula de arbitraje es lo suficientemente amplia, el árbitro tiene la autoridad de adjudicar prácticamente **todo tipo** de controversia legal.
>
> ........
>
> [U]na cláusula de arbitraje puede ser lo suficientemente amplia como para incluir entre

Apelaciones de Louisiana señaló, que la cuestión en torno a la ocupación del campo por la Ley Federal de Arbitraje, *supra*, con relación a la Ley de Arbitraje Comercial de Louisiana, La.R.S. 9:4201, *et seq.*, no tiene mayor consecuencia cuando ambos estatutos son similares y cuando la política favoreciendo al arbitraje es la misma:

> As this court has recognized, [...] the issue of federal preemption, or application of the Federal Arbitration Act at 9 U.S.C. 1, *et seq.*, as apposed to the Louisiana Binding Arbitration Law at La R.S. 9:4201, *et seq.*, is of little consequence… [T]he Federal Arbitration Act is "a collection of statutes which is very similar to the Louisiana Binding Arbitration Law."
>
> .......
>
> [T]he Louisiana Supreme Court in *Aguillard v. Auction Managemente Corp., 04-2804, 04-2857 (La. 6/29/05), 908 So. 2d 1*, stated that the positive law of Louisiana favors arbitration, and that this favorable treatment echos the Federal Arbitration Act ("FAA") at 9 U.S.C. [sec.] 1, *et seq.* The Court made it clear that due to the similarity of the foregoing statutes, it would adopt the liberal federal policy favoring arbitration agreements. The Court in *Aguillard* further resolved the split between our circuit courts, stating that it would adopt the liberal interpretation policy of the Second and Fourth Circuits, as opposed to the conservative policies of the First and Third Circuits at that time. Accordingly, a presumption of arbitrability now exists with regard to the enforceability of arbitration agreements under a contract of adhesion analysis. While the events giving rise to this suit arose prior to our Supreme Court's official adoption of the liberal interpretation of arbitration agreements, the Louisiana statutes already were in place. Therefore, federal preemption is not a real issue in this case, as the law of Louisiana does not conflict with the federal statutes. *Easterling v. Royal Manufactured Hous., LLC*, *supra*, págs. 403, 404

los asuntos a ser llevados a dicho foro **la existencia o no de un contrato.** (Énfasis suplido). *World Films, Inc. v. Paramount Pictures Corp.*, 125 D.P.R. 352, 362 (1990).[15]

En ese caso, la controversia se limitaba a determinar si un contrato verbal pactado entre las partes existía. En efecto, World Films, Inc., demandó a Atlantic International por alegadamente incumplir un acuerdo verbal mediante el cual la demandante distribuiría todo el producto fílmico de la demandada para el año 1986, bajo los mismos términos y condiciones del contrato escrito y suscrito por las partes el año anterior (1985). Allí, este Tribunal estableció que la propia demandante había aceptado que el contrato verbal tenía los mismos términos y condiciones que el contrato escrito del año anterior; el cual contenía una cláusula de arbitraje amplia. Esta consideración y el hecho de que en este caso, distinto al nuestro, aplicaba la Ley Federal de Arbitraje porque se trataba de un contrato en el comercio interestatal, llevó a este Tribunal a concluir que la controversia en torno a la existencia del contrato verbal debía ser dilucidada por un árbitro. *Íd.*, pág. 364.

---

[15] Véanse, *Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404, 1410 (9no Cir. 1989); *Sauer-Getriebe KG V. White Hydraulics, Inc.*, 715 F.2d 348, 350 (7mo Cir. 1983), cuya petición de *certiorari* ante el Tribunal Supremo de Estados Unidos fue negada, 464 U.S. 1070 (1984); *Becker Autoradio v. Becker Autroradiowerck GmbH*, 585 F.2d 39, 47 (3er Cir. 1978). En estos casos se resolvió que la existencia de un contrato es un asunto arbitrable. Véanse, además, C. Herrera Petrus, *Spanish Perspectives on the Doctrine of Kompetens-Kompetenz and Separability: A Comparative Analysis of Spain´s 1988 Arbitration Act*, 11 AM. Rev. Int´l ARB. 397, 400 (2000); M. Hoellering, *Arbitrability of Disputes*, 41 Bus. Law. 125, 142 (1985).

Asimismo, en el caso de autos, la parte peticionaria alega que el Contrato de Sociedad, además de ser inexistente, es nulo por carecer de un requisito de forma solemne. Sobre ese particular, hemos expresado que en los requisitos de forma *ad solemnitatem*, la forma es necesaria para la **existencia y validez** del contrato, por lo que sin esa forma el contrato es nulo e ineficaz. (Énfasis suplido). Véanse, *Gil v. Marini*, 167 D.P.R. 553, 565 (2006); *López Torres v. González Vázquez*, 151 D.P.R. 225, 232 (2000). Así pues, la inobservancia de un requisito de forma solemne, incide sobre la validez y sobre la existencia del contrato.

Por lo tanto, nos vemos precisados a resolver si los árbitros pueden adjudicar controversias en las que se impugne un contrato en su totalidad por ser, además de inexistente, nulo e inválido.

**A.**

El Tribunal Supremo de los Estados Unidos, tuvo ante su consideración una controversia similar a la que hoy nos toca resolver. En el caso de *Buckeye Check Cashing, Inc. v. Cardegna et al.*, 546 U.S. 440 (2006), al igual que en el caso de autos, el máximo Foro Federal tuvo que resolver si eran los jueces o los árbitros, los llamados a considerar una acción en la que se reclama la nulidad de un contrato en su totalidad cuando dicho contrato contiene

una Cláusula de Arbitraje.[16] En síntesis, dicho Foro, al interpretar la Sección 2 de la Ley Federal de Arbitraje, 9 U.S.C.A. Sec. 2,[17] razonó que los cuestionamientos relacionados a la validez de un convenio pueden dividirse en dos (2) clases: i) aquellos que cuestionan específicamente la validez de una Cláusula de Arbitraje; y ii) los que impugnan la validez del contrato en su totalidad, ya sea porque existen razones que afecten directamente todo el contrato o porque la ilegalidad de una de las cláusulas del contrato invalida el mismo en su totalidad.[18] *Íd.*, pág. 444. El Tribunal Supremo Federal

---

[16] "We decide whether a court or an arbitrator should consider the claim that a contract containing an arbitration provision is void for illegality". *Buckeye Check Cashing, Inc. v. Cardegna et*, *supra*, pág. 442.

[17] La Sección 2 de la Ley Federal de Arbitraje, *supra*, reza:

> a written arbitration agreement […] evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C.A. sec. 2. (Énfasis suplido).

[18] En *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, pág. 444, el Tribunal Supremo de Estados Unidos, interpretando la Sección 2 de la Ley Federal de Arbitraje, *supra*, expresó:

> Challenges to the validity of arbitration agreements 'upon such grounds as exist at law or in equity for the revocation of any contract' can be divided into two types. One type challenges specifically the validity of the agreement to arbitrate [Citas omitidas] […] The other challenges the contract as a whole, either on a ground that directly affects the entire agreement […] or on the ground that the illegality of one of the contract´s provisions renders the whole contract invalid.

Nótese, que el Art. 1 de la Ley Núm. 376, *supra*, según reseñado previamente es muy similar a la Sección 2 de la Ley Federal de Arbitraje, *supra*: "...Tal convenio será válido, exigible e irrevocable salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio". Art. 1 de la Ley Núm. 376, *supra*.

entendió que la controversia se enmarcaba en el segundo tipo. Al así razonar, utilizó, básicamente, dos (2) precedentes para resolver el caso: *Prima Paint Corp v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) y *Southland Corp. v. Keating*, *supra*.

En *Prima Paint Corp v. Flood & Conklin Mfg. Co.*, *supra*, el Tribunal Supremo Federal tuvo que resolver cual de los dos, el juez o el árbitro, tiene la autoridad para determinar si el contrato entre dos (2) negocios fue inducido por fraude. *Íd.*, pág. 402. Allí, el Tribunal Supremo Federal, adoptando la **doctrina de separabilidad**, resolvió, que si se trata de una cuestión de fraude, al haberse inducido la contratación de la cláusula arbitral específicamente, los tribunales federales deben resolver la controversia. (Énfasis suplido). *Íd.*, págs. 403-404. Sin embargo, cuando se trata de una cuestión de fraude, al haberse inducido a una parte a entrar en el contrato completo, y ese contrato tiene una Cláusula de Arbitraje amplia, son los árbitros los que deben atender dicha acción. *Íd.* Véase, D. Helfeld, *supra*, pág. 12.

Por su parte, en *Southland Corp. v. Keating*, *supra*, el máximo Foro Federal, sostuvo que la Ley Federal de Arbitraje, *supra*, creaba un cuerpo de normas sustantivas que era de aplicación tanto a los tribunales estatales como a los federales. *Íd.*, pág. 12. De esa manera, declaró inconstitucional una disposición de la Ley de California

sobre Inversión de Franquicias (*California Franchise Investment Act*) que exigía la consideración judicial exclusiva de cualquier disputa que surgiera bajo dicha ley aunque existiera un acuerdo de arbitraje. Véase, D. Helfeld, *supra*, pág. 13.

Así, a la luz de esos casos, en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, págs. 445-446, el Tribunal Supremo de Estados Unidos señaló:

> *Prima Paint* and *Southland* answer the question presented here by establishing three propositions. First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract´s validity is considered by the arbitrator in the first instance. Third, this arbitration law applies in state as well as federal courts.

Al aplicar dichos principios, el máximo Foro Federal dispuso que, como lo que se impugnaba en ese caso era el acuerdo principal y no específicamente la Cláusula de Arbitraje, dicha cláusula se podía poner en vigor aunque estuviera separada del contrato principal por medio de la doctrina de separabilidad. *Íd.*, pág. 446. Concluyó, que con independencia de que el reclamo se hiciera en un tribunal federal o en uno estatal, una acción que ataque la validez de un contrato como un todo y no específicamente la Cláusula de Arbitraje, debe ser atendida por un árbitro: "We reafirm today that regardless of whether the challenge is brougt in federal or state court, a challenge to the validity of the contract as a

whole, and not especifically to the arbitration clause, must go to the arbitrator". *Íd.*, pág. 449.

La decisión emitida en el caso de *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, fue ratificada, dos (2) años más tarde, en *Preston v. Ferrer*, 552 U.S. 346 (2008). Allí, la controversia era si la Ley Federal de Arbitraje, *supra*, podía ir por encima, no solamente de las leyes estatales que refieren ciertas controversias inicialmente a los foros judiciales, sino también, de aquellas leyes estatales que refieren disputas inicialmente a una agencia administrativa. *Íd.*, pág. 349.[19] El Tribunal Supremo Federal, confirmando en todos sus extremos a *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, resolvió, que cuando las partes deciden acordar arbitrar todas las controversias que surjan bajo un contrato, una ley estatal no podrá alojar la jurisdicción primaria a un foro judicial o administrativo, por ser ello contrario a la Ley Federal de Arbitraje, *supra*. Dicha disputa deberá ser elucidada por un árbitro. *Íd.*, págs. 349-350.[20]

---

[19] En ese caso, una de las partes (Ferrer) alegó que la otra parte (Preston) había obtenido una licencia en violación a una ley en el estado de California (*Talent Agencies Act*), por lo que el contrato no era válido. Además, adujo, que la controversia, conforme a la mencionada ley, debía resolverse exclusivamente por un organismo administrativo (*Labor Commissioner*). *A contrario sensu*, Preston alegó que el contrato era válido. Además, arguyó que como la controversia giraba en torno a la validez del contrato, y dicho contrato contenía una cláusula de arbitraje que relegaba al foro arbitral cualquier controversia que surgiera con relación a la validez o legalidad del acuerdo, la disputa debía ser resuelta por un árbitro. *Preston v. Ferrer*, *supra*, pág. 352.

[20] El Tribunal Supremo Federal expresó:

Cabe señalar, que tales precedentes han sido refrendados por los tribunales estatales de los Estados Unidos, ya bien por ser vinculantes[21] --al tratarse de una controversia en el comercio interestatal-- o por su carácter persuasivo, particularmente cuando existe consonancia (textual y de política pública) entre las leyes estatales y la Ley Federal de Arbitraje, *supra*.

El caso de autos se presenta bajo el segundo escenario. Ahí, podemos mencionar por ejemplo el caso de

---

In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-404, […] we held that attacks on the validity of an entire contract, as distinct from attacks aimed at the arbitration clause, are within the arbitrator's ken.

The litigation in *Prima Paint* originated in federal court, but the same rule, we held in *Buckeye,* applies in state court. 546 U.S., at 447-448 [...] The plaintiffs in *Buckeye* alleged that the contracts they signed, which contained arbitration clauses, were illegal under state law and void *ab initio.* [...] Relying on *Southland*, we held that the plaintiffs' challenge was within the province of the arbitrator to decide. [citas omitidas].

*Buckeye* largely, if not entirely, resolves the dispute before us. The contract between Preston and Ferrer clearly "evidenc[ed] a transaction involving commerce," 9 U.S.C. [sec.] 2, and Ferrer has never disputed that the written arbitration provision in the contract falls within the purview of [sec.] 2. Moreover, Ferrer sought invalidation of the contract as a whole. In the proceedings below, he made no discrete challenge to the validity of the arbitration clause. See 145 Cal. App. 4th, at 449, 51 Cal.Rptr. 3d, at 635 (Vogel, J., dissenting).[3] Ferrer thus urged the Labor Commissioner and California courts to override the contract's arbitration clause on a ground that *Buckeye* requires the arbitrator to decide in the first instance. *Preston v. Ferrer*, *supra*, págs. 353-354.

[21] Véanse, *Kirby v. Grand Crowne Travel*, 229 S.W.3d 253, 254-255 (Missouri, 2007); *Marty v. Beneficial Montana, Inc.*, 135 P.3d 790, 793 (Montana, 2006); *Johnson v. Jefferson County Racing Ass´n*, 1 SO.3d 960, 964 (Alabama, 2008); *Salley v. Option One Mortg. Corp.*, 592 Pa 323, 332-333 (Pennsylvania, 2007); *In re Labatt food service*, 279 S.W.3d 640, 649 (Texas, 2008); *Khosla v. Global Mortgage, Inc.*, 72 Va.Cir. 229, 231 (Virginia, 2006); *Charles Boyd Constr., Inc. v. Vacation Beach, Inc.*, 959 SO.2d 1227, 1232 (Florida, 2007).

*Lexington Mktg. Group v. Goldbelt Eagle, LLC*, 157 P.3d 470 (2007), donde el Tribunal Supremo de Alaska se alineó con la normativa federal, basado fundamentalmente en el paralelismo que hay entre su estatuto de arbitraje y el federal, y la política pública a favor del arbitraje que ambas jurisdicciones comparten.[22] Asimismo, en el caso de

---

[22] El Tribunal en ese caso expuso:

> Based on both the statutory language and the policy behind Alaska's Arbitration Act, we hold that state arbitration law aligns with federal law and does not permit a court determining arbitrability to consider the validity of the underlying agreement.
>
> The language of the state statute supports our holding that state arbitration law does not permit adjudication on the merits of the underlying agreement. The text of AS 09.43.010(a), which mirrors FAA [sec.] 2 , suggests that a court may only resolve public policy challenges when such claims are directed at the arbitration clause itself. *Buckeye* and *Prima Paint* have interpreted the analogous federal provision to require a court to enforce the arbitration clause unless a party asserts standard contract defenses, such as fraudulent inducement or void for public policy, against the arbitration clause itself.
>
> ........
>
> Strong public policy rationales support this position. Like federal law, state law strongly favors arbitrability. We have previously recognized the "strong public policy in favor of arbitration." Given this policy, we have indicated that "we . . . allow ambiguous contract terms to be construed in favor of arbitrability where such construction is not obviously contrary to the parties' intent." Forbidding courts from examining the merits of a dispute or the validity of the underlying contract furthers the primary benefit of arbitration – expeditious and inexpensive dispute resolution for the parties. This policy would be frustrated if parties could avoid arbitration by challenging the validity of the underlying agreement.
>
> Alaska's arbitration law closely follows federal arbitration law, and federal law has clarified that arbitration clauses are severable from the underlying contracts for purposes of challenges to the validity of the underlying agreement. Determinations as to the validity of the underlying contract are a matter for the arbitrator to decide. We therefore hold that state arbitration law, like federal law, did not permit the superior court's finding that the underlying contract was unenforceable. *Lexington Mktg. Group v. Goldbelt Eagle, LLC*, *supra*, págs. 475-476, 477.

*C.R. Klewing Northeast v. City of Bridgeport*,[23] 919 A.2d 1002 (2007), el Tribunal Supremo de Connecticut sostuvo lo resuelto en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, al partir de la premisa de que su estatuto de arbitraje era similar al estatuto federal.[24] Dicho Tribunal concluyó que, ante la ausencia de un ataque dirigido específicamente a la validez de la Cláusula de Arbitraje, la cuestión sobre la legalidad del contrato en su totalidad, era de la incumbencia de los árbitros. *Klewing Northeast v. City of Bridgeport*, *supra*, pág. 1014.[25]

---

[23] En dicho caso la parte demandada (City of Bridgepoint), alegaba que toda acción en la que se alegaba que un contrato que contenía una Cláusula de Arbitraje era nulo *ab initio*, por ser ilegal, debía ser resuelto por los tribunales y no por un panel de árbitros. Sostenía que la nulidad de un contrato acarreaba la nulidad de la Cláusula de Arbitraje subsumida en dicho contrato. Por el contrario, la parte demandante, (Klewing Northeast), sostenía, descansando en *Buckeye Check Cashing, Inc. v. Cardegna*, *supra*, que la cuestión en torno a la ilegalidad de un contrato, debía ser atendida, en primer lugar, por el panel de árbitros. *Klewing Northeast v. City of Bridgeport*, *supra*, pág. 1014.

[24] Dicho foro articuló:

> ...we noted that [sec.] 52-408 is similar to [sec.] 2 of the federal Arbitration Act. Section 2 of that act provides that written arbitration agreements shall be valid, irrevocable, an enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. [Citas omitidas] In construing a Connecticut statute that is similar to federal law, we are guided by federal case law....Thus, when there is no Connecticut case law directly on point, we may turn for guidance to the applicable federal law. [Citas omitidas]
>
> ........
>
> Given the similarity of [sec.] 52-408 to [sec.] 2 of the Federal Arbitration Act, we adopt the *Prima Paint Corp.* rule as applied in *Buckeye Check Cashing, Inc.*, as a matter of state arbitration law. *Klewing Northeast v. City of Bridgeport*, *supra*, págs. 1015, 1017.

[25] De hecho, el Tribunal Supremo de Connecticut, antes de que el Tribunal Supremo de Estados Unidos resolviera el caso de *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, ya había pronunciado que cuando se plantea la ilegalidad de un contrato, y no la ilegalidad de la Cláusula de Arbitraje específicamente, esa cuestión debía ser resuelta, en primer lugar, por los árbitros. *Naussbaum v. Kimberly*

De lo antes expuesto se desprende, en primer lugar, que tanto Alaska como Connecticut comparten con Puerto Rico la política pública a favor del arbitraje como método alterno de solución de conflictos. En segundo lugar, ambos estados han seguido la norma pautada en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, por guardar concordancia, más que nada, con su política arbitral.

Por la misma razón, entendemos que *Buckeye Check Cahing, Inc. v. Cardegna*, *supra*, y su progenie jurisprudencial, son compatibles en nuestra jurisdicción. El andamiaje de esa casuística tiene como soporte el mismo principio que hemos predicado en Puerto Rico, a saber: la fuerte política pública a favor del arbitraje. En ese sentido, no vemos ningún óbice que justifique el tener que desviarnos del derrotero que por años ha sesgado este Foro al resolver controversias ligadas al arbitraje comercial. Como bien expresó el ex Juez Asociado del Tribunal Supremo, señor Negrón García, si el razonamiento esbozado en la jurisprudencia federal o de otros estados de la Unión nos convence, es perfectamente apropiado acogerlo para resolver el caso que esté ante la consideración del Tribunal. Véase, *Pueblo v. Yip Berríos*, 142 D.P.R. 386, 430 n.3 (Negrón García, disintiendo, 1997).

---

*Timbers, Ltd.*, 856 A.2d 364, 370 (2004). En éste caso, el Tribunal Supremo de Connecticut, además de resaltar la existencia de una política vigorosa a favor del arbitraje, también reiteró la validez de la doctrina de separabilidad de las Cláusulas de Arbitraje. *Íd.*, págs. 369, 370.

Además, es preeminente señalar, que la doctrina de separabilidad reiterada en *Buckeye Check Cahing, Inc. v. Cardegna*, *supra*, vigoriza nuestra política pública a favor del arbitraje. Como veremos *a posteriori*, se trata de una doctrina diseñada para permitir, esencialmente, que la validez y existencia de los contratos que contienen Cláusulas de Arbitraje, sea adjudicada mediante dicho proceso.

**B.**

En el ámbito jurídico de Puerto Rico, existen diversas fuentes de las cuales surgen las obligaciones. El Art. 1042 del Código Civil, 31 L.P.R.A. sec. 2992, establece que las obligaciones nacen de la ley, de los contratos, de los cuasicontratos, y de los actos y omisiones ilícitos o en los que intervenga cualquier género de culpa o negligencia. Como bien expresamos al principio de nuestro análisis, las Cláusulas de Arbitraje son inherentemente contractuales. Por lo tanto, le son aplicables los principios inmanentes al derecho de obligaciones y contratos.

En el pasado, hemos señalado que el arbitraje puede surgir de una cláusula accesoria a un contrato principal mediante la cual las partes acuerdan someter a arbitraje sus desavenencias futuras, o puede surgir de un convenio por escrito para resolver una controversia existente. *Rivera v. Samaritano & Co., Inc.*, 108 D.P.R. 604, 608 (1979). No cabe duda de que el caso de autos se rige bajo

el primer supuesto. Es decir, la Cláusula de Arbitraje en controversia, al encontrarse inmersa en un contrato principal, es una accesoria.

Este tipo de cláusula u obligación accesoria, es incidental a la obligación principal "que si bien hay que cumplirla también, no ha sido el motivo determinante del negocio..." J.R. Vélez Torres & M. Fraticelli Torres, *Derecho de Obligaciones*: *Curso de Derecho Civil*, 2da ed., San Juan, Ed. ISBN, 1997, pág. 67. Este Foro, al expresarse sobre las obligaciones accesorias, ha señalado que se trata de obligaciones que se incorporan a los contratos para completar las estipulaciones de los contratantes, las cuales no constituyen el verdadero motivo para la celebración del contrato. Véase, *Municipio v. Vidal*, 65 D.P.R. 370, 375 (1945). Son obligaciones que dependen de otra principal a la cual se encuentran subordinadas, por lo que siguen la misma suerte de la obligación de la que dependen. Por eso, si la obligación principal no es válida, tampoco lo será, bajo este principio, la obligación accesoria.

Así por ejemplo, el Art. 1161 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3245, establece que cuando una obligación principal se extinga por el efecto de la novación, las obligaciones accesorias también se extinguirán, con excepción de aquellas que aprovechen a terceros que no hubiesen prestado su consentimiento. Es decir, como norma general la extinción de una obligación

conlleva la extinción de las garantías y demás derechos accesorios. *Teachers Annuity v. Soc. De Gananciales*, 115 D.P.R. 277, 282 (1984); *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 391 (1973).

Asimismo, el contrato de fianza en Puerto Rico tiene como una de sus características, ser una obligación accesoria a otra principal. *United v. Villa*, 161 D.P.R. 606, 615 (2004). La naturaleza accesoria de la fianza está plasmada en el Art. 1746 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4951, que dispone que: "[l]a obligación del fiador se extingue al mismo tiempo que la del deudor, y por las mismas causas que las demás obligaciones". Como bien señalamos en *A.I.I.Co. v. San Miguel*, 161 D.P.R. 589, 596 (2004), citando a J. Puig Brutau en su obra *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1982, T. 2, Vol. 2, págs. 587-588, la fianza implica la existencia de una obligación principal y de una accesoria que se pacta para garantizar el cumplimiento de la obligación principal. La obligación principal se da entre acreedor y deudor y la accesoria es entre fiador y acreedor para asegurar el pago o cumplimiento de la obligación del deudor. *Íd.*

A tenor con lo anterior, sería lógico colegir que en Puerto Rico, las Cláusulas de Arbitraje, cuando son accesorias al contrato principal, dependen de éste para su existencia y validez, por lo que si el contrato principal (donde se encuentra estipulada la Cláusula de Arbitraje)

es nulo, la cláusula arbitral también será nula. Ahora bien, sabido es que el Derecho no está ataviado de una coraza  impenetrable. Admite siempre, la penetración de doctrinas o figuras jurídicas que sean lisonjeras para resolver una controversia en particular, sobre todo cuando son compatibles con nuestro ordenamiento jurídico. Tal es el caso de la doctrina de separabilidad de las Cláusulas de Arbitraje.

La doctrina de separabilidad es una excepción a la norma general de que un pacto accesorio es nulo si el contrato principal es nulo. Ésta, según enunciada por el Tribunal Supremo Federal en *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, *supra*, y ratificada en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, puede definirse como aquel principio que reconoce la validez de una Cláusula de Arbitraje como si se tratara de un contrato independiente, aunque dicha cláusula se encuentre inmersa en un contrato principal. M. Domke, *op. cit.*, Vol. I, Sec. 11:1, págs. 1, 2.[26] De esta manera, al utilizar esta

---

[26] Como bien apunta un autor:

> Under the doctrine of "separability" or "autonomy" of the arbitration clause, arbitration clauses are regarded as independent agreements separate from the (main) agreement by which the parties intend to regulate the legal relationship referred to in the arbitration clause. This independent nature affords the arbitration clause a different destiny than that of the main agreement: its non-existence, invalidity or termination does not follow from the non-existence, invalidity or termination of the main agreement. Since arbitrators derive their power from an agreement functionally independent from the main agreement--albeit often formally included within it ("*clauses compromissoires*")-- a challenge to the latter does not call into question their adjudicatory authority. C. Herrera Petrus, *supra*, pág. 400.

doctrina, un árbitro puede pasar juicio sobre la validez o existencia de un contrato ya que con independencia de que éste sea nulo, la Cláusula de Arbitraje tendría vigencia propia y separada de dicho contrato. Véase, *Íd.*, Vol. I, sec. 11.1, pág. 4. Es decir, la Cláusula de Arbitraje se reputa separada al contrato principal. Como corolario, cuando se impugna la validez del contrato principal, ello no tiene el efecto, *ipso facto*, de truncar la Cláusula de Arbitraje subsumida en el contrato.

Cabe destacar, que esta doctrina ha sido considerada un avance en contra de los prejuicios que por años habían empañado el desarrollo del arbitraje como un método alterno de solución de disputas en los Estados Unidos.[27] De hecho, la doctrina de separabilidad, incluyendo como hemos visto a Estados Unidos,[28] ha sido endosada por

---

[27] Véanse, P.J. Martinez Fraga & R. Domingo Osle, *Globalization and Developments in the Apportionment of Jurisdiction between Arbitrators and Courts Concerning International Commercial Arbitration*, 8 J. Int'l Bus. & L. 63, 88-89 (2009); P.H. Bergeron, *At the Crossroads of Federalism and Arbitration: The Application of Prima Paint to Purportedly Void Contracts*, 93 Ky.L.J. 423, 462 (2005). Véase, además en general, A. Scott Rau, *Everything You Really Need to Know about "Separability" in Seventeen Simple Propositions*, 14 Am. Rev. Int´l Arb. 1 (2003). *Cf.*, *Richard C. Reuben*, *First Options, Consent to Arbitration, and the Demise of Separability: Restoring Access to Justice for Contracts with Arbitration Provision*, 56 S.M.U.L. Rev. 819 (2003). ("separability perverts contract law because it assumes away the fundamental principle of contractual consent"; "the separability doctrine should be repudiated as archaic [and] unworkable"). *Íd.*, págs. 827, 845.

[28] Véanse, por los foros federales, *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 680-81 (8vo Cir. 2001); *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 476-477 (9no Cir. 1991). Véanse, por los tribunales estatales, *Jackson Mills, Inc. v. BT Capital Corp.*, 440 S.E.2d 877, 879 (South Carolina, 1994); *Quirk v. Data Terminal Systems, Inc.*, 400 N.E.2d 858, 861 (Massachusetts, 1980); *Two Sisters, Inc. v. Gosch & Co.*, 370 A.2d 1020 (1976); *Flightways Corp. v. Keystone Helicopter Corp.*, 331 A.2d 184, 186 (Pennsylvania, 1975). Véase, además en general, *Brucker v. McKinlay Transport, Inc.*, 557 N.W.2d 536 (Michigan, 1997). Estos casos ejemplifican la receptividad con que las cortes federales y estatales se comportaron con respecto a

distintos  países  entre  los  cuales  se  encuentran

Inglaterra,[29] España[30], Francia[31] y Alemania[32].

Algunos de los argumentos que se han esgrimido para favorecer la doctrina de separabilidad, sobre todo en casos donde se alegue la inexistencia o nulidad de un contrato en su totalidad, son: i) evitar la inconveniencia de requerirle a un tribunal que determine si un acuerdo es válido con el único propósito de establecer finalmente que el árbitro tiene autoridad para resolver la disputa surgida de ese acuerdo, duplicando así los procesos decisorios;[33] ii) evitar que las partes recurran a tácticas dilatorias con el mero propósito de retrasar o evadir el proceso de arbitraje pactado; iii) honrar la intención de

---

la doctrina de separabilidad, desde antes que fuera reiterada en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*.

[29] Véanse, C. Herrera Petrus, *supra*, pág. 408; J.J. Coe Jr., *Building the Civilization of Arbitration: Book Review of: Margaret L. Moses, The Principles and Practice of International Commercial Arbitration*, 113 Penn St. L.Rev. 1369, 1387 (2009).

[30] La nueva Ley de Arbitraje Española, JUS/60/2003 de 23 de diciembre de 2003, *Aranzadi*, *Repertorio Cronológico de Legislación*, pág. 8726 (2003), reconoce expresamente en su Artículo 22, el principio de separabilidad de las cláusulas de arbitraje:

> Los árbitros estarán facultados para decidir sobre su propia competencia, incluso sobre las excepciones relativas a la existencia o a la validez del convenio arbitral o cualesquiera otras cuya estimación impida entrar en el fondo de la controversia. A este efecto, el convenio arbitral que forme parte de un contrato se considerará como un acuerdo independiente de las demás estipulaciones del mismo. La decisión de los árbitros que declare la nulidad del contrato no entrañará por sí sola la nulidad del convenio arbitral.

[31] Véase, C. Herrera Petrus, *supra*, pág. 408.

[32] *Íd.*, pág. 406.

[33] Si el Tribunal determina que el acuerdo de arbitraje es válido, entonces lo tendría que remitir a un árbitro para que éste adjudique las demás controversias. De su faz, esto representaría una duplicidad de procesos y de gastos para las partes.

las partes al convenir el arbitraje y; iv) la conveniencia de que las partes pueden perfectamente excluir la aplicación de dicha doctrina, redactando una Cláusula de Arbitraje, cuyo lenguaje delimite su alcance. Véanse, *Íd.*, págs. 398, 400, 401, 402; P.H. Bergeron, *supra*, pág. 462; J.J. Barceló III, *International Commercial Arbitration: Who decides de Arbitrator´s Jurisdictión? Separability and Competence-Competence in Transnational Perspective*, 36 Vand. J. Transnat´l L. 1115, 1120 (2003). Véase, además en general, A. Scott Rau, *supra*.

Como ha expresado un autor, sin la aplicación de esta doctrina, los árbitros tendrían que limitarse a escuchar reclamaciones que no cuestionen la existencia o validez de un contrato en su totalidad, lo cual es ineficiente de su faz:

> It is quite practical to understand that when parties agree to resolve all disputes arising from their legal relationship by means of arbitration, unless expressly agreed to the contrary, they intend arbitrators to resolve even disputes concerning the validity of the arbitration agreement itself. C. Herrera Petrus, *supra*, pág. 401.

Claro está, no todas las controversias que surjan entre las partes deberán resolverse por un árbitro. Después de todo, como apunta un autor, "[a] party should be entitled to its day in court unless it has agreed to arbitrate". J.J. Barcelo III, *supra*, pág. 1210. Además, para que el arbitraje sea ordenado por un tribunal, será necesario que las partes, no solamente lo hayan pactado, sino que se trate de un acuerdo de arbitraje amplio, que

no circunscriba la intervención de los árbitros a controversias claramente definidas. Es decir, la doctrina de separabilidad requiere, para ser aplicable, que los pactos de arbitraje sean suficientemente amplios. M. Domke, *op. cit.*, Vol. I, Sec. 11.1, pág. 2. En estos casos, la presunción a favor del arbitraje aplica con mayor fuerza. *Íd.*, Vol. 1, Sec. 15:6, pág. 35.[34]

Un ejemplo de una cláusula de arbitraje amplia la encontramos en el propio caso de *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, págs. 442-443, la cual leía, *inter alia*:

> Any claim, dispute or controversy...arising from or relating to this Agreement...or the validity, enforceability, or scope of this Arbitration Provision or the entire Agreement (collectively Claim), shall be resolved, upon the election of you or us or said third-parties, by binding arbitration... Véanse, además, *Preston v. Ferrer*, *supra*, pág. 352; *Naussbaum v. Kimberly Timbers, Ltd.*, *supra*, pág. 369; *Klewing Northeast v. City of Bridgeport*, *supra*, pág. 1008 n. 6.

Ciertamente, el lenguaje en esa cláusula explícitamente hacía referencia a reclamaciones relacionadas a la validez del contrato. Empero, como atinadamente apuntó el Tribunal Supremo de Alaska en *Lexington Mktg. Group v. Goldbelt Eagle, LLC*, *supra*, pág. 475, la norma esbozada por el Tribunal Supremo de Estados Unidos en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, lejos de ser restrictiva, fue una de carácter

---

[34] Véase, *A T & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986). Véase, además, *Webb v. Investacorp, Inc.*, 89 F.3d 252, 259 (5to Cir. 1996); *Ladertex, Inc. v. Morgganton Dyeing & Finishing Corp.*, 67 F.3d 20, 27 (2do Cir. 1995).

general, que no estuvo predicada en una lectura, *ad verbatim*, del acuerdo de arbitraje en controversia, sino, en principios amplios.[35] Por lo tanto, somos del criterio de que para aplicar los principios reconocidos en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, el pacto de arbitraje no tiene que ser un *alter ego* del que estaba en controversia en dicho caso. Lo medular es que se trate de una cláusula suficientemente amplia.

Así, a los jueces nos compete auscultar si la Cláusula de Arbitraje pactada entre las partes es taxativa, o *a contrario sensu*, si es lo suficientemente amplia como para permitir que una controversia en torno a la validez o existencia del contrato principal, sea

---

[35] Allí el máximo Foro Federal de Alaska, interpretó una Cláusula de Arbitraje que disponía lo siguiente: "All disputes or claims arising under this Agreement shall be submitted to binding arbitration before a single arbitrator in Juneau, Alaska if demand for arbitration is made in a notice given by either party". *Lexington Mktg. Group v. Goldbelt Eagle, LLC*, *supra*, pág. 472. En lo pertinente el Tribunal acotó:

> Goldbelt Eagle attempts to distinguish *Buckeye* by arguing that the arbitration clause in *Buckeye* was more exhaustive than the clause at issue in this case. Although Goldbelt Eagle is correct that this arbitration agreement is drafted differently from the clause at issue in *Buckeye*, the Supreme Court's holding in *Buckeye* was broad. It was not predicated on a close reading of the agreement at issue in that case; the Court did not parse the language of the agreement, nor did it refer back to the language of the clause after initially quoting it. Instead, the Court relied on several broad principles: (1) "an arbitration provision is severable from the remainder of the contract"; (2) "the issue of the contract's validity is considered by the arbitrator in the first instance"; and (3) "this arbitration law applies in state as well as federal courts." Thus, regardless of whether the arbitration agreement at issue is identical to the agreement before the Court in *Buckeye*, the Court's holding applies. *Íd.*, pág. 475.

adjudicada por los árbitros. M. Domke, *op. cit.*, Vol. 1, Sec. 15:6, pág. 33; A. Scott Rau, *supra*, págs. 27-31.

Con este trasfondo doctrinal, pasemos a evaluar la controversia en cuestión.

**IV.**

En primer lugar, la parte peticionaria aduce que *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, es distinguible del caso de autos porque en aquél, la Cláusula de Arbitraje sometía al árbitro la decisión de si el contrato en su totalidad era válido o no, mientras que en el presente caso, las partes no sometieron a arbitraje la determinación de la validez del contrato. Véase, *Moción Informando Nueva Jurisprudencia del Tribunal Supremo de los Estados Unidos*, pág. 10. En ese sentido, es preciso analizar la Cláusula de Arbitraje (Cláusula Catorce del Contrato de Sociedad) convenida por las partes en el caso de autos, la cual reza:

> **Las diferencias y cuestiones que pudieran suscitarse entre los socios, bien sea por razón de lo estipulado en este contrato, ya que por actos en el curso y dirección de los negocios en ella comprendidos o al procederse a la liquidación de la compañía**, se decidirán por árbitros o amigables componedores que deberán ser nombrados uno por cada socio y en caso de discordia, los mismos árbitros nombrarán un tercero quien pronunciará su laudo final, el cual, así como la resolución de los árbitros, se considerarán definitivos y a cuyas decisiones se someten desde ahora los socios. (Énfasis suplido).[36]

---

[36] Véase, Exhibit D de la Petición de *Certiorari* presentado por la parte peticionaria, *Contrato Privado de Constitución de Sociedad Regular Colectiva*, pág. 122.

*Prima facie*, de la preterida cláusula, saltan a la vista tres (3) tipos de categorías o controversias arbitrables: i) las diferencias y cuestiones que pudieran suscitarse entre los socios por razón de lo estipulado en el contrato; ii) las diferencias y cuestiones que pudieran suscitarse entre los socios por actos en el curso y dirección de los negocios y; iii) las diferencias y cuestiones que pudieran suscitarse entre los socios al momento de liquidarse la compañía. A pesar de esa taxonomía, surge de manera clara --tal y como lo interpretó el Tribunal de Primera Instancia en el caso de autos-- que se trata de una cláusula muy abarcadora. En efecto, la Cláusula de Arbitraje, en esos tres (3) grupos, parece incluir prácticamente todo tipo de controversias relacionadas al Contrato de Sociedad sin limitarse a los términos y condiciones del contrato.

Las palabras "diferencias y cuestiones" denotan que la gama de situaciones arbitrables es aún mayor, puesto que no se identifican con exactitud los asuntos susceptibles de arbitraje en cada categoría. Por eso, cuando la cláusula hace referencia a las diferencias y cuestiones relacionadas a lo estipulado en el Contrato de Sociedad, no podemos excluir con certeza, las cuestiones que giren en torno a la validez del Contrato de Sociedad. Esto, puesto que muy bien se puede interpretar que ese tipo de controversia está intrínsecamente ligada al Contrato de Sociedad y lo allí estipulado. Es decir, si el

Contrato de Sociedad fuera írrito o inexistente, ello tendría injerencia o relación directa con lo estipulado en el mismo; lo estipulado en el contrato no tendría validez alguna. Por eso, el lenguaje utilizado en la mencionada cláusula, nos mueve a colegir, que se pueden arbitrar asuntos colaterales, extrínsecos a los términos y condiciones del contrato *per se*, como lo es la validez de éste. Véase, *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74-75 (2do Cir. 1997).

Adviértase, que aún si se arguyera lo contrario --que la Cláusula de Arbitraje se limita a cuestiones vinculadas a los términos estipulados en el Contrato de Sociedad y no a asuntos relacionados a la validez del mismo-- existiría una duda legítima sobre el alcance de dicha cláusula, y es un principio cardinal de hermenéutica en nuestra jurisdicción, que toda duda que pueda existir sobre el alcance de las controversias susceptibles a arbitraje, debe resolverse a favor de dicho mecanismo. *U.C.P.R. v. Triangle Engineering Corp.*, *supra*, págs. 141-142, 143; *Quiñones v. Asociación*, *supra*, pág. 673; *WorldCrisa Corp. v. Armstrong*, *supra*, pág. 75.

Además, aunque la consabida cláusula no hace alusión expresa a controversias relacionadas a la validez del Contrato de Sociedad, tal explicitud no es necesaria para que pueda aplicarse lo pautado en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra* y su progenie, puesto que dicho caso propugnó principios amplios que no se limitaban

al pacto de arbitraje convenido entre las allí en controversia. Véase, *Lexington Mktg. Group v. Goldbelt Eagle, LLC*, *supra*, pág. 475.

A la luz de lo anterior, el sentido común[37] nos advierte que es razonable concluir que existe una relación estrecha entre el reclamo de la parte peticionaria y lo estipulado en el Contrato de Sociedad. Por consiguiente, nos parece que la Cláusula de Arbitraje objeto del caso de autos, es suficientemente amplia como para permitir el arbitraje de la acción interpuesta por la parte peticionaria.

Por otro lado, la parte peticionaria, en su intento de distinguir lo resuelto en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, del caso de autos, alega que en éste, el Contrato de Sociedad acordado entre las partes no es meramente nulo o inválido sino que es inexistente y que por tanto, la Cláusula de Arbitraje allí subsumida es también inexistente. Sostiene, que al tratarse de un contrato de naturaleza mercantil, tenía que constar en escritura pública lo cual no se hizo. Fundamenta su posición en que en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, págs. 444 n. 1, el Tribunal Supremo Federal distinguió entre una controversia relacionada a la validez de un contrato y una en que el contrato nunca se concluyera: "[t]he issue of the contract's validity is

---

[37] "[E]n materia de hermenéutica, […] el sentido común está inmerso en toda interpretación". *Pueblo v. López Rodríguez*, 118 D.P.R. 515, 531 (1987).

different from the issue of whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today addresses only the former..." No le asiste la razón.

Es conspicuo que la reclamación que hace la parte peticionaria tiene el efecto de cuestionar la validez del contrato por una razón que podría afectar directamente todo el contrato, y no específicamente la Cláusula de Arbitraje. Véase, *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, pág. 444. En nuestro ordenamiento jurídico, conforme expusimos, la omisión de un requisito de forma *ad solemnitatem*, afecta tanto la existencia como la validez del contrato o negocio jurídico en cuestión. Véanse, *Gil v. Marini*, *supra*; *López Torres v. González Vázquez*, *supra*. Por eso, en esos casos, la validez es consustancial a la existencia y viceversa, siendo corolarios inseparables de la omisión de un requisito de forma solemne. Es decir, son dos caras de una misma moneda.

Por consiguiente, a la luz de lo resuelto en *Buckeye Check Cashing, Inc. v. Cardegna et al.*, *supra*, la validez de un contrato es un asunto que puede ser llevado ante la consideración de un árbitro por virtud de la doctrina de separabilidad de las Cláusulas de Arbitraje. En ese sentido, la pretensión de la parte peticionaria, de exponer como dicotómicos los conceptos "validez" *vis a vis* "existencia", con el objeto de preterir el proceso de arbitraje, carece de méritos a la luz de *Buckeye Check*

*Cashing, Inc. v. Cardegna et al.*, *supra*. Por ende, concluimos que el cuestionamiento realizado por la parte peticionaria con relación al Contrato de Sociedad, a quien le compete adjudicarlo es al árbitro y no a los tribunales.

Después de todo, no debemos olvidar, que en nuestra jurisdicción el arbitraje es considerado un medio valioso para resolver controversias en una sociedad, que merece el más decidido apoyo y aliento. *McGregor-Doniger, Inc. v. Tribunal Superior*, *supra*.

**V.**

Por todo lo antes expuesto, se confirma por fundamentos distintos la Sentencia recurrida emitida por el Tribunal de Apelaciones, en la que ordenó a las partes en controversia someterse al proceso de arbitraje pactado.

Se dictará Sentencia de conformidad.

Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pablo Méndez Acevedo,
Monserrate Acevedo Feliciano y
la Sociedad Legal de
Gananciales compuesta por
ambos

    Demandantes-Peticionarios

             v.

Héctor Juan Nieves Rivera, et
als

    Demandados-Recurridos

CC-2006-0143       *Certiorari*

SENTENCIA

En San Juan, Puerto Rico, a 22 de junio de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se confirma por fundamentos distintos la Sentencia recurrida emitida por el Tribunal de Apelaciones, en la que ordenó a las partes en controversia someterse al proceso de arbitraje pactado.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurre sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo