Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| JORGE LUIS GUZMÁN RIVERA<br><br>Demandante-Apelante<br><br>Vs.<br><br>PEPSI-COLA PUERTO RICO, LLC Y SU ASEGURADORA ABC<br><br>Demandados-Apelados | KLAN202400492 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm. PO2022CV01330 (605)<br><br>SOBRE: LEY NÚM. 45 DEL 18 DE ABRIL DE 1935, SOBRE DISCRIMEN POR IMPEDIMENTOS Y LEY NÚM. 80 DE 30 DE MAYO DE 1976, SEGÚN ENMENDADA SOBRE DESPIDO INJUSTIFICADO |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de mayo de 2025.

Comparece la parte apelante, Jorge Luis Guzmán Rivera y solicita la revocación de una *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Ponce. Por medio de la sentencia sumaria apelada, el Tribunal de Primera Instancia declaró Con Lugar la *Moción de Sentencia Sumaria* de la parte apelada, Pepsi-Cola Puerto Rico, LLC, y desestimó con perjuicio todas las reclamaciones presentadas por el apelante.

Por los fundamentos expuestos en esta sentencia, *confirmamos* la sentencia sumaria apelada.

**-I-**

El 20 de mayo de 2022 la parte apelante presentó una demanda en la cual reclamó despido injustificado y también

discrimen por impedimento en la modalidad de denegatoria de acomodo razonable. Según las alegaciones en la demanda:

4. La Parte Demandante, Jorge Luis Guzmán Rivera, en adelante Sr. Guzmán, se desempeñó como empleado comenzando sus labores desde junio del año 2000 habiendo trabajado por espacio de alrededor de 20 años para la parte demandada.

5. Para allá a mediados de mayo de 2021, el Sr. Guzmán advino en conocimiento mediante el Representante de la Unión de Tronquistas de Puerto Rico, en adelante Unión, de nombre Argenis Caraballo, que había sido terminado de su posición en la parte demandada.

6. La parte demandante realizaba trabajos como "Merchandiser" o promotor de ventas, que requerían fuerza de su parte como, por ejemplo, levantar, trasladar y acomodar cajas pesadas de las bebidas producidas por Pepsi, la aquí demandada.

7. El salario de la parte demandante era a $10.85 dólares la hora, tenía otorgado un "car allowance" por la suma de $500.00 y cuando se realizaban ventas, se le otorgaban una serie de comisiones.

8. Desde el año 2012, la parte demandante ha sufrido de varias condiciones, entre ellas, lesión de espalda baja, cervicales, hombros, codos, todos productos de accidentes laborales.

9. En la última ocasión, para allá agosto del 2020, encontrándose, laborando, levantando y organizando cajas de Pepsi, la espalda le molestó a un nivel tan grave que le impidió caminar y agarrar bien los objetos, a lo cual tuvo que descontinuar con sus labores de ese día.

10. La parte demandante insistía en solicitar que le asignaran funciones más razonables y llevaderas, puesto que los medicamentos le dificultaban conducir las rutas asignadas para la entrega y recogido de productos y porque cargar dichas mercancías que muchas veces pesaban bastante, le agravaba la condición de espalda. La condición médica de la parte demandante lo obligaba a realizar paradas durante la ruta para poder aliviar su molestia de la espalda mientras manejaba. De esta situación, la parte demandante le informó en varias ocasiones al Patrono.

11. La parte demandada ignoraba el pedido de la parte demandante para que le brindara acomodo razonable.

12. Tanto fue así, que la parte demandante tuvo que acudir a la Comisión del Fondo de Seguro del Estado para solicitar asistencia en el envío de documentos a la parte demandada sobre su necesidad de acomodo razonable.

13. La parte demandada nunca envió la documentación requerida a la Comisión del Fondo del Seguro del Estado, a lo cual dicha entidad, procedió a cerrar el caso del Sr. Guzmán, aquí la parte demandante.

14. La parte demandante les informó a sus supervisores sobre la situación del acomodo razonable por las necesidades y condiciones médicas que tenía el Sr. Guzmán. Los supervisores nunca se comunicaron, ni llamaron, ni se reunieron con el Sr. Guzmán.

15. Cuando la parte demandante tuvo que dejar de trabajar para allá agosto de 2020, es a través del representante de la Unión, (mencionado en el acápite 5), que éste le envía un correo electrónico donde el supervisor de Recursos Humanos, el Sr. Pedro Homar Rodríguez, le indica que el empleado Jorge Guzmán será terminado.

16. No llamaron ni tampoco se reunieron con el representante de la Unión para atender dicho asunto.

Tras varios trámites, el 2 de octubre de 2023 la parte apelada presentó *Moción de Sentencia Sumaria*. La parte apelante no presentó la correspondiente oposición. Esto a pesar de contar con múltiples prórrogas que, totalizaron 160 días a favor del apelante para presentar una oposición a la solicitud de sentencia sumaria. No obstante, el apelante optó por cruzarse de brazos, y dejar sometida la moción de sentencia sumaria.

El 9 de abril de 2024 el Tribunal de Primera Instancia, dictó sentencia sumaria en la cual consignó 70 determinaciones de hechos. Entre los hechos de la sentencia destacamos que, la parte apelante era un empleado unionado bajo el convenio colectivo vigente entre la parte apelada y sus empleados en las fechas de empleo de la parte apelante. El tribunal concluyó, como cuestión de hecho que, la parte apelante "no presentó su querella ante el foro de arbitraje ni cumplió con los pasos dispuestos por el Procedimiento de Quejas y Agravios en el Convenio Colectivo".

En consecuencia, desestimó con perjuicio todas las reclamaciones presentadas por el apelante. En cuanto a las causas de acción, el foro apelado concluyó que, antes de acudir al tribunal,

el apelante debió someter el asunto a arbitraje según el convenio colectivo suscrito por él. En la alternativa, concluyó que, el despido estuvo justificado y fue no discriminatorio, debido a que, al momento del apelante solicitar acomodo razonable, la parte apelada no contaba con puestos vacantes para los cuales la parte apelante cualificara, y, de todas formas, el apelante tampoco solicitó otro puesto como alternativa de acomodo razonable.

Inconforme, la parte apelante acude ante este tribunal y apunta el siguiente error:

> Err[ó] el Honorable Tribunal al declarar con lugar la Moción de Sentencia Sumaria y dictar una Sentencia Con Perjuicio de todas las reclamaciones presentadas por el demandante en contra de la parte demandada.

Examinado el recurso y con el beneficio de la comparecencia de las partes, procedemos a resolver.

*-II-*

*-A-*

El mecanismo procesal de la sentencia sumaria surge de la Regla 36.1 de Procedimiento Civil. El propósito de esta regla es facilitar la solución justa, rápida y económica de litigios civiles en los cuales no existe controversia real y sustancial de hechos materiales que no requieren ventilarse en un juicio plenario. *Rodríguez García v. UCA*, 200 DPR 929, 940 (2018); *Bobé et al. v. UBS Financial Services*, 198 DPR 6, 20 (2017); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013). Mediante este mecanismo, una parte puede solicitar que el tribunal dicte sentencia sumaria de la totalidad de la reclamación o de parte de esta. De esta forma se promueve la descongestión de calendarios, así como la pronta adjudicación de controversias cuando una audiencia formal resulta en una dilación innecesaria. *Vera v. Dr. Bravo*, 161 DPR 308, 331-332 (2004).

Ahora bien, el mecanismo de sentencia sumaria solo está disponible para la disposición de aquellos casos que sean claros; cuando el tribunal tenga ante sí la verdad de todos los hechos esenciales alegados en la demanda; y que solo reste por disponer las controversias de derecho existentes. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.,* 136 DPR 881, 911-912 (1994). Asimismo, al evaluarse los méritos de una solicitud de sentencia sumaria, el juzgador debe actuar guiado por la prudencia, consciente en todo momento de que su determinación puede privar a una de las partes de su día en corte. *León Torres v. Rivera Lebrón,* 204 DPR 20, 44 (2020). De la mano con este precepto del debido proceso de ley, el juzgador deberá utilizar el principio de liberalidad a favor del opositor de la moción, lo cual implica que, de haber dudas sobre la existencia de controversias de hechos materiales, entonces deberán resolverse a favor de la parte que se opone a la moción de sentencia sumaria. *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 138 (2015); *Ramos Pérez v. Univisión,* 178 DPR 200, 216-217 (2010).

Para prevalecer en una moción de sentencia sumaria, su promovente tiene que establecer su derecho con claridad y debe demostrar que no existe controversia en cuanto a ningún hecho material, o sea, ningún elemento de la causa de acción. *Meléndez González et al. v. M. Cuebas, supra,* pág. 110. Por hechos materiales se entienden aquellos que pueden afectar el resultado de una reclamación de acuerdo con el derecho sustantivo. *Ramos Pérez v. Univisión, supra,* pág. 213. La controversia sobre el hecho material debe ser real. *Íd.* A saber:

> [U]na controversia no es siempre real o sustancial, o genuina. La controversia debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario. La fórmula, debe ser, por lo tanto, que la moción de sentencia sumaria adecuadamente presentada sólo puede negarse si la parte que se opone a ella presenta una oposición basada en hechos que puedan mover a un juez a resolver a su favor. Si el juez se convence de que no existe una posibilidad razonable de que escuchar lo que lee no podrá conducirlo a una decisión a favor de esa parte, debe

dictar sentencia sumaria. *Íd.,* págs. 213-214 *citando a* P. E. Ortiz Álvarez, *Hacia el uso óptimo de la sentencia sumaria,* 3 (Núm. 2) Forum 3, 8 (1987).

En suma, deberá demostrar que: (1) no es necesario celebrar una vista; (2) el demandante no cuenta con evidencia para probar algún hecho sustancial; y (3) procede como cuestión de derecho. R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil,* 2017, pág. 317.

En contraste, el oponente a la moción de sentencia sumaria está obligado a establecer que existe una controversia que sea real en cuanto a algún hecho material a la controversia y, en ese sentido, no es cualquier duda la suficiente para derrotar la solicitud. *Meléndez González et al. v. M. Cuebas, supra.* En efecto, la duda debe ser tal que permita concluir que existe una controversia real y sustancial sobre los hechos materiales. *Íd.,* citando a *Ramos Pérez v. Univisión, supra,* pág. 214. De esta manera, central entre las responsabilidades de la parte promovida se encuentra que debe puntualizar los hechos propuestos que pretende controvertir, haciendo referencia a la prueba específica que sostiene su posición. *León Torres v. Rivera Lebrón, supra.* Es decir, "la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa". *Íd.* De esta forma, no puede descansar en meras aseveraciones o negaciones de sus alegaciones, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa. *SLG Zapata-Rivera v. JF Montalvo, supra; Ramos Pérez v. Univisión, supra,* pág. 215; *Cruz Marcano v. Sánchez Tarazona,* 172 DPR 526, 550 (2007). Lo anterior, además, es cónsono con los requerimientos establecidos por las Reglas de Procedimiento Civil.

En síntesis, ha quedado establecido que los tribunales no podrán dictar sentencia sumaria en cuatro situaciones: (1) cuando existan hechos materiales y esenciales controvertidos; (2) cuando

existen alegaciones afirmativas en la demanda sin refutar; (3) cuando surge de los propios documentos que acompañan la moción en solicitud de sentencia sumaria que existe una controversia sobre algún hecho material o esencial; o (4) cuando no procede como cuestión de Derecho. *Oriental Bank v. Perapi*, 192 DPR 7, 26-27 (2014).

En materia estrictamente procesal, de acuerdo con las Reglas 36.1 y 36.2 de Procedimiento Civil, el promovente de la moción de sentencia sumaria deberá establecer, mediante declaraciones juradas o con prueba admisible en evidencia, que no existe controversia real respecto a hechos materiales de la controversia. Específicamente, la Regla 36.1 de Procedimiento Civil, *supra*, prescribe el momento en que una parte reclamante puede solicitar una sentencia sumaria a su favor, estableciendo lo siguiente:

> Una parte que solicite un remedio podrá presentar, en cualquier momento después de haber transcurrido veinte (20) días a partir de la fecha en que se emplaza a la parte demandada, o después que la parte contraria le haya notificado una moción de sentencia sumaria, pero no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba, una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada.

En cambio, la Regla 36.2 de Procedimiento Civil regula el momento en que una parte contra quien se reclama solicita el remedio de la sentencia sumaria, disponiendo lo siguiente:

> Una parte contra la cual se haya formulado una reclamación podrá presentar, a partir de la fecha en que fue emplazado pero no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba, una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación.

Entretanto, la Regla 36.3 de Procedimiento Civil establece el procedimiento para la consideración de la moción de sentencia

sumaria, así como el contenido de la moción y de la contestación de la parte promovida. Respecto a la moción de sentencia sumaria, la Regla 36.3(a) de Procedimiento Civil dispone que tendrá que desglosar lo siguiente:

(1) una exposición breve de las alegaciones de las partes;
(2) los asuntos litigiosos o en controversia;
(3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;
(4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;
(5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y
(6) el remedio que debe ser concedido.

Mientras tanto, la Regla 36.3(b) de Procedimiento Civil prescribe que la contestación a la moción de sentencia sumaria debe contener, además de los sub incisos (1), (2) y (3) del inciso (a): una relación de los hechos esenciales y pertinentes que están en controversia, con referencia a los párrafos enumerados por la parte promovente y con indicación de la prueba en la que se establecen esos hechos; una enumeración de los hechos que no están en controversia; y las razones por las cuales no se debe dictar la sentencia, argumentando el derecho aplicable.

A estas disposiciones, la Regla 36.3(c) de Procedimiento Civil añade que, cuando se presente una moción solicitando sentencia sumaria y se sostenga conforme a la Regla 36 la parte promovida no podrá descansar únicamente en las aseveraciones contenidas en sus alegaciones. Por el contrario, estará obligada a contestar tan detallada y específicamente como lo haya hecho la parte promovente de la moción. De no hacerlo, la referida Regla prescribe que se dictará la sentencia sumaria en su contra, si procede.

De otra parte, en *Meléndez González et al. v. M. Cuebas, supra,* el Tribunal Supremo delineó el estándar que el Tribunal de

Apelaciones debe utilizar para revisar una denegatoria o una concesión de una moción de sentencia sumaria.

En primer lugar, reafirmó que el Tribunal de Apelaciones se encuentra en la misma posición que el TPI al momento de revisar solicitudes de sentencia sumaria, siendo su revisión una *de novo* y teniendo la obligación de regirse por la Regla 36 de Procedimiento Civil y los criterios que la jurisprudencia le exige al foro primario. *Meléndez González et al. v. M. Cuebas, supra*, pág. 118. Asimismo, deberá examinar el expediente de la manera más favorable hacia la parte promovida, llevando a cabo todas las inferencias permisibles a su favor. *Íd*. Ahora bien, reconoció que el foro apelativo está limitado, toda vez que no podrá tomar en consideración evidencia que las partes no presentaron ante el foro primario, ni podrá adjudicar los hechos materiales en controversia. *Íd*.

En segundo lugar, prescribió que el Tribunal de Apelaciones deberá revisar que tanto la moción en solicitud de sentencia sumaria, como la oposición, cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil. *Íd*.

En tercer lugar, ante la revisión de una sentencia dictada sumariamente, el Tribunal de Apelaciones deberá revisar si en realidad existen hechos materiales en controversia y, de haberlos, estará obligado a exponer específicamente cuáles hechos materiales están en controversia y cuáles no, en cumplimiento con la Regla 36.4 de Procedimiento Civil. *Íd*.

En cuarto lugar, dispuso que, si encuentra que los hechos materiales realmente no están en controversia, entonces el Tribunal de Apelaciones deberá revisar *de novo* si el foro primario aplicó correctamente el Derecho. *Íd.*, pág. 119.

*-B-*

En nuestra jurisdicción existe una vigorosa política pública a favor del arbitraje. *S.L.G. Méndez-Acevedo v. Nieves Rivera,* 179 DPR

359, 368 (2010). Lo anterior, motivado por el interés del Estado de facilitar la solución de disputas que emanen de una relación contractual por vías más rápidas, flexibles y menos onerosas que los tribunales. *H.R., Inc. v. Vissepó & Diez Constr.*, 190 DPR 597, 605 (2014). A su vez, "[e]s indubitado el carácter contractual que comporta la figura del arbitraje". *VDE Corporation v. F & R Contractors*, 180 DPR 21, 33 (2010). Cuando los contratantes se obligan a utilizar el arbitraje como método para resolver las controversias, "se crea un foro sustituto a los tribunales de justicia, cuya interpretación merece gran deferencia". *Depto. Educ. v. Díaz Maldonado*, 183 DPR 315, 325 (2011), citando a *CFSE v. Unión de Médicos*, 170 DPR 443, 449 (2007).

El arbitraje es una figura jurídica inherentemente contractual. Por su naturaleza convencional, se puede exigir únicamente cuando se ha pactado y cuando se ha hecho constar por escrito. *Íd.*, pág. 367. Pactado en un contrato que toda controversia o reclamación que surja de su interpretación o que esté relacionada con el contrato sería resuelta por arbitraje, los tribunales recurren a la referida política en favor del arbitraje. *PaineWebber, Inc. v. Soc. de Gananciales*, 151 D.P.R. 307, 312 (2000); *McGregor-Doniger v. Tribunal Superior*, 98 D.P.R. 864, 869 (1970). El convenio será válido, exigible e irrevocable salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio. *S.L.G. Méndez Acevedo v. Nieves Rivera*, 179 DPR 359, 366 (2010).

*-C-*

La Ley Núm. 44 de 2 de julio de 1985, según enmendada (Ley Núm. 44-1985), se adoptó con el objetivo de garantizar la igualdad en circunstancias en las cuales personas con discapacidad física, mental o sensorial enfrentan tratos discriminatorios que limitan su oportunidad de participar, desempeñarse y competir

adecuadamente en el campo laboral. 1 LPRA sec. 501 *et seq.*; *Guardiola Álvarez v. Depto. de la Familia,* 175 DPR 668 (2009).

En aras de incrementar la garantía sobre igualdad en el empleo, la Asamblea Legislativa enmendó la Ley Núm. 44-1985 mediante la aprobación de la Ley Núm. 105 de 20 de diciembre de 1991 con el propósito de atemperar nuestro estatuto con la Ley Pública Federal de 26 de julio de 1990, 29 USCA sec. 706 *et seq.*, conocida comúnmente como la Ley ADA. Esta enmienda introdujo la obligación de todo patrono de proveerle acomodo razonable a las personas con impedimentos en el lugar de trabajo. *García v. Darex PR Inc.*, 148 DPR 364, 385 (1999).

El acomodo razonable puede incluir, el proveer facilidades accesibles y disponibles para personas con impedimentos, rediseño del trabajo, modificación de horario de trabajo, reasignar a una posición vacante, y aquellos otros acomodos similares para personas con impedimentos. 42 U.S.C. sec. 12111(9)(A).[1] La responsabilidad de tomar dicha acción afirmativa es de tal envergadura, que solo se exime a un patrono de su cumplimiento en aquellos casos donde el acomodo requerido resulte en un esfuerzo económico extremadamente oneroso. *Guardiola Álvarez v. Depto. De la Familia*, *supra.*

Por su parte, en el Art. 1 de la Ley Núm. 44-1985 se definen los términos *acomodo razonable* y *persona con impedimentos físicos, mentales o sensoriales*. A saber:

> (b) **Acomodo razonable**- significará el ajuste lógico adecuado o razonable que permite o faculta a una persona cualificada para el trabajo, con limitaciones

---

[1] The term "reasonable accommodation" includes:

> A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities and, B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipments or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities"

físicas, mentales o sensoriales ejecutar o desempeñar las labores asignadas a una descripción o definición ocupacional. Incluye ajustes en el área de trabajo, construcción de facilidades físicas, adquisición de equipo especializado, proveer lectores, ayudantes, conductores o intérpretes y cualquier otra acción que razonablemente le facilite el ajuste a una persona con limitaciones físicas, mentales o sensoriales en su trabajo y que no representa un esfuerzo extremadamente oneroso en términos económicos.

Significará, además, la adaptación, modificación, medida o ajuste adecuado o apropiado que deben llevar a cabo las instituciones privadas y públicas para permitirle o facultarle a la persona con impedimento cualificada a participar en la sociedad e integrarse a ella en todos los aspectos, inclusive, trabajo, instrucción, educación, transportación, vivienda, recreación y adquisición de bienes y servicios.

[…]

(d) **Persona con impedimentos físicos, mentales o sensoriales**- Significará toda persona con un impedimento de naturaleza motora, mental o sensorial, que le obstaculice o limite su inicio o desempeño laboral, de estudios o para el disfrute pleno de la vida y que está cualificada para llevar a cabo las funciones básicas de ese trabajo o área de estudio, con o sin acomodo razonable.

Se entenderá, además, que es una persona con impedimentos bajo la protección de este capítulo, toda aquella persona cuyo impedimento le limite sustancialmente su desempeño en una o más actividades principales del diario vivir; que la persona tenga un historial previo de esa condición o se le considere como que tiene dicho impedimento aun cuando no lo tiene.

Para los propósitos de este capítulo se considerará como impedimento sensorial aquel que afecte sustancialmente, la audición, visión, tacto, olfato y el habla. 1 LPRA secc. 501.

Por su parte, el Art. 5 de la Ley Núm. 44-1985, prohíbe que tanto las instituciones públicas como las empresas privadas ejerzan, pongan en vigor o usen procedimientos, métodos o prácticas discriminatorias de empleo por razón de impedimentos físicos, mentales o sensoriales por el mero hecho del tal impedimento. 1

LPRA sec. 505. La prohibición incluye desde la etapa de reclutamiento hasta la compensación, los beneficios marginales y las facilidades de acomodo razonable y accesibilidad, antigüedad, participación en programas de adiestramiento, promoción y cualquier otro término, condición o privilegio en el empleo. *Íd.*

Cuando un empleado que alega estar cobijado bajo el palio de la Ley Núm. 44-1985 y solicita un acomodo razonable según dispone la referida ley, tiene que demostrar, primeramente, que es una persona con impedimento según lo define la ley, y segundo, que está cualificado para llevar a cabo las funciones básicas de ese trabajo, con o sin el acomodo razonable. *Morales Bengochea v. Banco Popular*, 173 DPR 74 (2008) (Sentencia); *García v. Darex PR, supra.*

Una vez el empleado formalice su solicitud de acomodo razonable, el patrono viene obligado a iniciar un proceso interactivo con dicho empleado para analizar si resulta posible conceder el remedio solicitado y la forma en que puede concederse el mismo. A. Acevedo Colom, *Legislación Protectora del Trabajo Comentada*, 7ª ed. rev., 2001, pág. 272. A la luz de lo anterior, el patrono puede solicitar la información que considere necesaria para realizar la acción de acomodo razonable solicitada. *Íd.* El empleado entonces deberá producir la información requerida. De no hacerlo, no se le puede imputar responsabilidad al patrono por negarse a proveer el acomodo razonable solicitado. Esto es, toda vez que no se provea la información necesaria para proceder con una solicitud de acomodo razonable, no se le puede imponer responsabilidad al patrono. *Íd.*, citando, *Templeton v. Nevada Services, Inc.*, 162 F.3d 617 (10th Cir. 1998).

Cabe resaltar que, para que surja la obligación del empleado proveer información, *esta debe ser indispensable para proveer el acomodo y debe estar relacionada a la condición que genera el impedimento.* Acevedo Colom, *op. cit.,* pág. 272. La petición de

acomodo razonable no requiere que sea por escrito o cualquier otra forma en especial, basta que el patrono advenga en conocimiento de la necesidad del empleado de un acomodo razonable. *Morales Bengochea v. Banco Popular, supra,* citando; Acevedo Colom, *op. cit.*, págs. 285-286.

La obligación del patrono de proveer un acomodo razonable no significa que este tenga que proveer la mejor alternativa posible si existen diversas formas de proveer la alternativa presentada por el empleado o si existen otras alternativas disponibles. Acevedo Colom, *op. cit.*, pág. 273. Por otro lado, y a modo de excepción, un patrono no tendrá la obligación de conceder un acomodo razonable bajo la Ley ADA ni la Ley Núm. 44-1985 si el mismo representa un esfuerzo extremadamente oneroso para el patrono. 42 U.S.C. sec. 12111 (10)(A); 1 LPRA secc. 507a. Sin embargo, para determinar si el acomodo constituye un esfuerzo extremadamente oneroso, se examina principalmente la naturaleza y costo del acomodo necesario, los recursos financieros de la entidad, el número de empleados, y el efecto de los gastos y recursos o el impacto en las operaciones de las facilidades. 42 U.S.C sec. 12111 (10)(B).[2]

---

[2] Undue hardship:

**(A)** In general

The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

**(B)** Factors to be considered

In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include -

**(i)** the nature and cost of the accommodation needed under this chapter;

**(ii)** the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

**(iii)** the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

**(iv)** the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

Es norma reiterada que la Ley Núm. 44-1985 se debe interpretar de la forma más beneficiosa para las personas con impedimentos. 1 LPRA secc. 511a. Cónsono con ello, la referida ley dispone en su Art. 14 que todas las ramas gubernamentales y las personas naturales o jurídicas, al interpretar esta legislación, deben utilizar una interpretación liberal y no restrictiva. *Íd.* Se precluye la utilización, como precedente reductor del alcance de los derechos de las personas con impedimentos, de toda decisión de un tribunal o una agencia administrativa federal que interprete o haya interpretado de una manera restrictiva y contra los intereses de las personas con impedimentos la Ley ADA. *Íd.*

Por otra parte, el empleado demandante deberá presentar suficiente evidencia que demuestre lo siguiente: (a) que es una persona incapacitada según definido en la Ley ADA o la Ley Núm. 44; (b) que podía llevar a cabo las funciones esenciales de su puesto con o sin acomodo razonable; y (c) que, aun conociendo el patrono de la incapacidad de la parte demandante, éste no hizo un esfuerzo razonable para proveer el acomodo solicitado. *EEOC v. Kohl´s Dept. Stores, Inc.,* 774 F 3d 127 (2014); *Freadman v. Metro. Prop. and Cas. Inc. Co.,* 484 F .3d 91, 102 (1st Cir.2007).

Por lo que, el demandante tiene el peso de la prueba para demostrar que solicitó el acomodo razonable de forma precisa o suficiente. La solicitud deberá ser: (1) suficientemente directa y específica y (2) deberá explicar cómo el acomodo solicitado está relacionado con la incapacidad. *Freadman v. Metro. Prop. and Cas. Inc. Co., supra.*

Además, el demandante deberá probar que el acomodo solicitado es razonable, que le permitirá llevar a cabo las funciones esenciales de su puesto, y que es viable que el patrono lo conceda. Si el demandante cumple con probar lo antes mencionado, el

demandado deberá probar que el acomodo es una petición excesivamente onerosa. *Íd.*

### -D-

La Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como la Ley de Indemnización por Despido Injustificado, 29 LPRA sec. 185 *et seq.* ("Ley Núm. 80"), fue creada con el propósito de atender todo lo relacionado al despido de trabajadores en la empresa privada y las circunstancias en que un patrono así lo puede hacer. *Feliciano Martes v. Sheraton,* 182 DPR 368 (2011); *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894, 904 (2011). La Ley Núm. 80 se aprobó "con el fin primordial de proteger de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo mediante la aprobación de una ley que, a la vez que otorgue unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado, desaliente la incidencia de este tipo de despido". *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 424 (2013) citando, la Exposición de Motivos de la Ley Núm. 80. En esencia, dicha ley establece que todo empleado que sea despedido de su cargo, sin que haya mediado justa causa, tendrá derecho a recibir de su patrono una compensación conocida como la mesada. Artículo 1 de la Ley 80, 29 LPRA sec. 185a; *Rivera Figueroa v. The Fuller Brush Co., supra,* pág. 905.

Por estar ante una legislación de naturaleza reparadora, los tribunales están obligados a interpretar la Ley Núm. 80 de manera liberal a favor de los derechos del trabajador, resolviendo toda duda a favor del obrero para así cumplir con sus propósitos eminentemente sociales y reparadores. *Rivera Figueroa v. The Fuller Brush Co., supra,* pág. 906; *Whittenburg v. Col. Ntra. Sra. Del Carmen,* 182 DPR 937, 951 (2011). La Ley Núm. 80 también tiene una función coercitiva y, un objetivo desalentador contra el capricho

patronal. *Íd.* Por tanto, la Ley Núm. 80 tiene un valioso propósito social y coercitivo, a saber, sancionar que un patrono despida a su empleado o empleada, salvo que demuestre una causa justificada para ello. *Jusino et al., v. Walgreens,* 155 DPR 560, 571 (2001); Véase, además, *Romero v. Cabrer Roig,* 191 DPR 643, 653 (2014).

*-III-*

Primeramente, nos corresponde examinar si ambas partes cumplieron con los requisitos de forma que exige la Regla 36 para luego examinar si existen hechos materiales en controversia que impidan la adjudicación del caso sumariamente para después aplicar el derecho aplicable.

Según mencionado, los tribunales apelativos estamos en igual posición que el foro sentenciador al revisar un petitorio sumario. Conforme a la norma aplicable, quien se opone a una solicitud de sentencia sumaria viene obligado a enfrentar la moción de forma tan detallada y específica como efectuado por el promovente. Así, en su oposición, el promovido debe puntualizar aquellos hechos propuestos que pretende controvertir, y hacer referencia a la prueba específica que sostiene su posición, según exigido por la Regla 36.3 de Procedimiento Civil.

La *Moción de Sentencia Sumaria* presentada por la parte apelada ante el foro primario contiene una exposición breve de las alegaciones de las partes, una relación de los asuntos en controversia, la petición de sentencia sumaria, una relación organizada y puntual en párrafos numerados sobre los hechos esenciales y pertinentes que no están en controversia, con la evidencia admisible que fundamenta cada hecho propuesto. Igualmente, la parte apelada incluyó las razones para la procedencia del dictamen sumario a su favor, y el remedio a ser concedido. Por lo anterior, concluimos que, la solicitud de la parte apelada cumplió

con los requisitos estatutarios y jurisprudenciales exigidos por la Regla 36.3 de las de Procedimiento Civil.

En cambio, la parte apelante no presentó escrito de oposición a la moción de sentencia sumaria presentada por la parte apelada.

La Regla 36.3 (b) de Procedimiento Civil, requiere a la parte que, desea tanto derrotar como establecer un hecho, acreditarlo con prueba admisible para cada uno. Como dijimos, lo anterior, no ocurrió en este caso, la parte apelada no presentó un escrito en oposición a la solicitud sumaria de la parte apelada.

Igualmente, en el recurso apelativo, la parte apelante incumplió con la por la Regla 16 (C) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B. En específico, el cuerpo de la apelación carece de una discusión fundamentada del error señalado. Esta disposición reglamentaria debe observarse rigurosamente para el correcto perfeccionamiento de los recursos. *Hernández Maldonado v. Taco Maker*, 181 DPR 281, 290 (2011).

No obstante, la parte apelante no rebatió la presunción de corrección que cobija la decisión recurrida, y cada uno de los hechos en la sentencia, están fundamentados en evidencia admisible según requiere la regla procesal y su casuística. Por ello, los adoptamos como parte de esta sentencia:

1. El 19 de julio de 2000, Guzmán comenzó a laborar con Pepsi como empleado temporero, ocupando el puesto de Merchandiser.

2. El 1 de octubre de 2000, el demandante pasó a ser empleado regular y se mantuvo ocupando el puesto de Merchandiser hasta la fecha de terminación de su empleo.

3. Desde el 19 de junio de 2000 hasta su despido, Guzmán ocupó el puesto de Merchandiser, realizando las funciones descritas en la hoja de deberes de dicho puesto.

4. En los últimos cinco (5) años de empleo del demandante, éste se reportó al Sr. José R. Vázquez Plata ("Vázquez"), Jefe Regional, y desde el 2020, el Sr. Edwin Sepúlveda ("Sepúlveda"), Supervisor de Ventas.

5. El puesto de Merchandiser que ocupaba el demandante es un puesto unionado, el cual se rige por el Convenio Colectivo suscrito entre Pepsi y la Unión, vigente desde el 1 de junio de 2019 hasta el 31 de mayo de 2022.

6. Durante su empleo, el demandante fue delegado de la Unión e, incluso, acompañó a empleados a vistas de arbitraje y conocía el proceso de agravios y arbitraje establecido en el Convenio Colectivo.

7. Para adjudicar cualquier controversia, conflicto o disputa sobre la suspensión o despido de un empleado unionado, el Convenio Colectivo vigente al momento del despido del demandante establece el proceso de Agravios y Arbitraje, cuyo último paso es la presentación de la disputa ante el NCA.

8. El Artículo 9 del Convenio Colectivo dispone lo siguiente:

PROCESO DE AGRAVIOS Y ARBITRAJE

Sección 1. Cualquier queja y agravio relacionado con la administración e interpretación de las cláusulas de este convenio, que de cualquier manera afecte a los empleados cubiertos por este convenio y mientras el mismo estén en vigor, será radicado o presentada sujeta a lo que ha sido acordado en este Artículo que será el vehículo exclusivo para la resolución de cualquier queja y/o agravio.

Sección 2. El término "días laborables" se debe entender como de lunes a viernes, con excepción de los días feriados, durante las horas regulares de trabajo. Si la queja no es procesada por la Unión dentro de los límites de tiempo estipulados en cada uno de los pasos de este Artículo, se considerará abandonada y no se procesará con los siguientes pasos. Los periodos de límite contenidos en este Artículo solo pueden ser extendidos por mutuo acuerdo entre la Compañía y la Unión por escrito. Se entiende que sí el agravio se relaciona a reclamaciones por salarios bajo este Convenio, no se renuncia a los periodos límites dentro de la ley.

Sección 3. Cualquier controversia, disputa o conflicto que surja entre la Unión, los Empleados y la Compañía respecto al significado o la aplicación de este Convenio, así como respecto a cualquier medida disciplinaria tomada por la Compañía contra cualquier empleado, los siguientes procedimientos serán aplicables para la solución de dichas controversias.

PRIMER PASO

El empleado agraviado y/o con la asistencia del delegado y/o la asistencia del Representante de la unión discutirá el asunto con el supervisor inmediato correspondiente y/o el Jefe de Departamento, dentro de los primeros cinco (5) días luego de ocurrido el agravio. El supervisor inmediato y/o el Jefe de Departamento tendrán cinco (5) días para contestar. Si el agravio no es procesado por la Unión dentro del término estipulado en este párrafo se considerará abandonada y no se procederá con los siguientes pasos.

9. Ni el demandante ni la Unión presentaron una queja o querella por su despido o por alguna alegada violación a las disposiciones del precitado Convenio Colectivo con relación al demandante.

10. Como Merchandiser, el demandante debía:

   a. Cumplir con su asignación de visita y ejecución de clientes programados para el día, para garantizar la ejecución en el punto de visita.

   b. Revisar, limpiar y separar el producto en bodega y en frio para garantizar la correcta rotación de inventario en el punto de venta.

   c. Colocar el material POP y exhibición de producto con el fin de persuadir la decisión del comprador y consumidor en el punto de venta.

   d. Contar, separar y organizar envase de vacío del punto de venta para dar visibilidad al cliente de la necesidad de productos a solicitar en la próxima visita del ejecutivo de ventas.

   e. Organizar el producto según planograma en equipo frio con la finalidad de mayo exposición al porfolio prioritario a consumidores y compradores.

   f. Cumplir completa y consistentemente con los estándares, políticas y procedimientos de la Compañía en conjunto con las leyes locales y federales aplicables a la industria, negocios y prácticas de empleo.

11. El demandante describió como sus funciones principales en un día regular de trabajo las siguientes:

   a. Visitar los clientes asignados en su ruta, esto incluía supermercados,

almacenes y algunos clientes de formato pequeño o mercado frio;

b. Organizar y suplir los productos a supermercados y almacenes;

c. Trasladar la mercancía del almacén a la góndola, estante o cooler del cliente; y

d. Hacer el *display* de productos al cliente.

12. Las cajas de producto que el demandante tenía que trasladar y levantar variaban desde diez (10) libras – refrescos en latas mini – hasta cuarenta (40) a cincuenta (50) libras, de padrinos y refrescos.

13. Para trasladar las cajas de producto del almacén a la góndola del cliente, el demandante utilizaba el equipo del cliente. Este equipo podía ser pallet jacks o carritos.

14. Para trasladar los productos, el demandante tenía que montar las cajas en los pallet jacks o carritos. Además, frente a la góndola, debía levantar las cajas para sacarlas, abrirlas e irlas preparando. Entonces, colocaba el producto en la góndola de forma individualizada.

15. Para realizar sus tareas, el demandante debía realizar las siguientes actividades con frecuencia: caminar, estar de pie, agacharse, levantar y empujar objetos pesados, entre otras.

16. Las funciones esenciales del demandante como Merchandiser requerían que éste levantara, diaria y frecuentemente, pesos entre unas doce (12) y cincuenta (50) libras.

17. El demandante visitaba de tres (3) a cinco (5) clientes diariamente. Los clientes del demandante, en su mayoría, eran de formato grande, es decir, de mayor volumen de cajas de producto.

18. Como parte de sus funciones, el demandante debía conducir para visitar a los clientes. El tiempo de conducir, según el demandante, era aproximadamente unas cuatro (4) horas.

19. El demandante trabaja en día entre trecientas (300) a quinientas (500) cajas de producto.

20. Para el 2020, el volumen de cajas anual trabajadas en la ruta del demandante era 127,918.

21. Para el 2020, los Merchandisers a tiempo completo que supervisaba Sepúlveda eran: Rafael Ruiz, Luis Orengo, Sam Figueroa, Brian Roche, Luis Cruz, Jorge Guzmán, Jayson del Río, Edgar Carrero, Bryan E. Rivera y Alberto Plaza.

22. En su ruta, el demandante atendía clientes de Ponce, Adjuntas, Villalba y Juana Díaz.

23. El 26 de agosto de 2020, el demandante presentó un certificado médico de la Dra. Joyce L. Vargas colocándolo en descanso hasta el 7 de septiembre de 2020. Dicho certificado expresaba como condición de salud "Covid-19 suspect".

24. El 21 de septiembre de 2020 el demandante presentó otro certificado médico del Dr. Luis A. Barranco que lo colocaba en descanso hasta el 1 de noviembre de 2020.

25. El 25 de septiembre de 2020, la Dra. Joyce L. Vargas también completó al demandante la sección del "Certificado Médico" del Formulario de Solicitud de Beneficios por Enfermedad para Trabajadores Asegurados bajo el Seguro Choferil. En dicho certificado, la Dra. Vargas indicó que el demandante estaría impedido de trabajar hasta el 2 de noviembre de 2020. Además, en el certificado, la Dra. Vargas incluyó un diagnóstico de Covid-19 y enfermedad disco lumbo sacral con mielopatía.

26. A base de lo establecido en el Formulario de Solicitud de Beneficios por Enfermedad, Pepsi le concedió al demandante acogerse a la licencia de Seguro Choferil, hasta el 2 de noviembre de 2020.

27. El demandante no solicitó una extensión del Seguro Choferil, sino que el 29 de octubre de 2020, presentó un Certificado Médico adicional de la Dra. Vargas, colocándolo en descanso hasta el 11 de enero de 2021. En dicho certificado, se indicó como naturaleza de la condición M50.03, M5117.

28. Pepsi concedió al demandante una licencia, desde el 1 de noviembre de 2020 hasta el 11 de enero de 2021, bajo FMLA y/o licencia médico familiar.

29. Los Certificados Médicos sometidos por el demandante no lo autorizan a trabajar, tampoco solicitan un acomodo razonable para este. En cambio, todos estos certificados lo colocaban en descanso como no apto para trabajar.

30. El 11 de enero de 2021, el demandante solicitó, por conducto del Sr. Argenis Carrillo ("Carillo"), Presidente de la Unión, una licencia adicional sin paga.

31. Para ese momento, el demandante continuaba inhabilitado para trabajar y estaba evaluando una operación para su espalda.

32. Conforme lo solicitado por Carrillo, Pepsi acordó con la Unión concederle al demandante una licencia adicional, sin paga, de tres (3) meses para que el demandante pudieses recuperarse y reincorporarse a sus funciones y/o realizar las gestiones necesarias para acogerse a los beneficios del Seguros Social por incapacidad. Dicha licencia adicional expiraría el 11 de abril de 2021.

33. Entre febrero y marzo de 2021, la Unión, por conducto de Carrillo, solicitó evaluar la posibilidad de que el demandante pudiera reincorporarse a sus funciones con una modificación significativa de su ruta.

34. El demandante solicitó una ruta menor impacto, es decir, que le acomodaran su ruta solo clientes de formato pequeño o mercado frío, ya que en estos el volumen de cajas que se maneja es menor.

35. El Sr. Ramón Rodríguez, entonces Gerente de Ventas, Jefe Regional, y Sepúlveda, Supervisor de Ventas, realizaron un análisis sobre la viabilidad del acomodo solicitado por el demandante.

36. Del análisis realizado por Rodríguez, Vázquez y Sepúlveda surgió que al menos dos Merchandisers se verían impactados significativamente de concederse el acomodo al demandante.

37. El acomodo solicitado por el demandante conllevaba que otros Merchandisers, además de atender a los clientes en sus respectivas rutas, tuvieran que cubrir los clientes de mayor volumen de la ruta original del demandante. Esto, pues, los clientes que el demandante deseaba que le removieran de su ruta eran los de mayor volumen.

38. El análisis realizado por Pepsi reflejó que restructurar la ruta del demandante conllevaba una reducción en el volumen para Guzmán de 81,323 cajas que tendrían que distribuirse entre otros Merchandisers que atendieran la zona geográfica que atendía el demandante.

39. Conforme al arreglo solicitado por el demandante, el volumen de cajas que el demandante dejaría de atender representaría un aumento de 150,767 a 180,545 en el volumen de cajas que manejaba el Merchandiser Brian Roche. De igual manera, el volumen de cajas que manejaba el Merchandiser Luis Orengo aumentaría de 316,624 a 331,343 cajas.

40. Además, la creación de la ruta solicitada por el demandante conllevaba que este tuviera que visitar más clientes diariamente, ya que, en lugar de tres (3) a cinco (5) clientes, este visitaría ocho (8) y nueve (9) clientes diariamente. Esto requería más tiempo conduciendo y sentado. Por tanto, también era oneroso para el demandante.

41. Dado que el acomodo razonable solicitado por el demandante constituía una carga onerosa y conllevaba crearle un puesto de tareas livianas ("light duty job"), Pepsi denegó el acomodo razonable.

42. Pedro Homar Rodríguez (Homar"), Gerente de Gente y Gestión, le notificó la denegatoria del Acomodo a la Unión por conducto de Carillo.

43. El demandante no recuerda que Carillo le comunicara que su solicitud de acomodo en torno a la ruta había sido denegada. No recuerda la conversación.

44. Aunque el acomodo en su ruta fue denegado, Pespsi mantuvo al demandante en su licencia adicional sin paga hasta el 11 de abril de 2021, según fue requerido por la Unión el 11 de enero de 2021.

45. Luego de agotarse el periodo de licencia adicional otorgado al demandante, la Unión solicitó a Homar que se concediera otro tiempo adicional de licencia al demandante para que este pudiera recuperarse y/o realizar las gestiones necesarias para acogerse a los beneficios del Seguros Social por incapacidad. Esto ya que el demandante aún no se encontraba en condiciones para retornar a sus funciones de Merchandiser.

46. Homar accedió a la solicitud de la unión y, por tanto, como acomodo extendió hasta el 19 de mayo de 2021.

47. Desde octubre de 2020, el neurocirujano del Demandante, Dr. Reynaldo De Jesús había indicado que el demandante no podía levantar pesos superiores a diez (10) libras, así como que debía evitar cualquier trauma a la espalda baja.

48. Del récord médico del demandante con el Dr. De Jesús surgen los siguientes diagnósticos: low back pain, radiculopaty, lumbosacral region, other intervertebral disc degeneration, lumber region, other intervertebral disc degeneration, lumbosacral region, cervical region, cervicalgia.

49. El demandante reconoció en su deposición que le indicó a la Dra. Evelyn García, sicóloga clínica que lo evaluó para el Seguro Social, que, cuando estaba trabando en Pepsi, "no tenía fuerza para sacar mercancía de las cajas en su trabajo".

50. El demandante reconoció en su deposición que, independientemente de que fuera menos cajas al año, él se había dado cuenta que con el solo hecho de manejar la mercancía, no tenía fuerzas en las manos para eso.

51. De noviembre de 2020 a diciembre de 2020 (mientras estuvo en licencia autorizada para Pepsi) el demandante trabajó en la Farmacia Vicario en Yauco en customer service, pero tuvo que dejar de trabajar porque se sentía inhabilitado para trabajar por sus condiciones médicas.

52. A solo un mes de su despido, el demandante indicó en el Informe de Función-Adulto, Administración de Seguro Social tener las siguientes condiciones o restricciones que le limitaban su capacidad para trabajar: "se me adormecían las manos y pies. Dolor crónico de espalda, cuello, pecho y brazos. No tengo

fuerzas en los brazos y piernas. No puedo estar de pie ni sentado por mucho tiempo ni caminar largas distancias". Además, indicó que no podía conducir, iba de pasajero.

53. Asimismo, en el referido Informe Función, el demandante indicó que sus condiciones lo limitaban grandemente y marcó que estaba limitado en las siguientes actividades; levantar cosas, agacharse, doblarse, estar de pie, alcanzar, caminar, sentarse, arrodillarse, subir/bajar escaleras, la memoria, completar tareas, concentrarse, seguir instrucciones, el uso de las manos y llevarse bien con otras personas.

54. Para el 19 de mayo de 2021, la Unión y el demandante le confirmaron a Homar que Guzmán no estaba apto para regresar a sus funciones de Merchandiser. Por tanto, dado que el demandante había agotado todos los balances y licencias disponibles, e, incluso, tras habérseles concedido un tiempo adicional para este poder reestablecerse y regresar a sus funciones, efectivo el 21 de mayo de 2021, Pepsi dio de baja de su empleo al demandante.

55. Tanto al momento del despido, como cuando Guzmán solicitó su acomodo, no existían otros puestos vacantes para los que este cualificara y el demandante no solicitó ningún puesto como alternativa de acomodo.

56. Homar notificó el despido del demandante por conducto de la unión, específicamente a través de Carrillo.

57. El demandante manifestó que se enteró de su despido el 14 de junio de 2021, mediante correo electrónico de Carrillo.

58. Posterior a conocer sobre su despido, el demandante no presentó una querella de arbitraje a su despido, [sic] ni en cuanto a alguna violación a los artículos del Convenio Colectivo.

59. El demandante solicitó los beneficios del Seguro Social por incapacidad del 27 de mayo de 2021.

60. Efectivo el 19 de octubre de 2021, al demandante se le aprobaron los beneficios del Seguro Social por incapacidad.

61. El demandante testificó expresamente en su deposición que no estaba demandando ni reclamando despido injustificado. En efecto, declaró que solo reclamaba discrimen por el acomodo razonable, y que no tenía ninguna otra reclamación.

62. En particular, el demandante declaró en su deposición lo siguiente:

P. Le pregunto, ¿cuál es la razón por la que usted entiende que Pepsi despidió injustificadamente?

R. Es que no es un despido injustificado.

P. ¿No?

R. No. Yo estoy haciendo una reclamación por discrimen.

P. Okey. Debo entonces entender, ¿Qué usted no reclama que su despido hay sido sin justa causa?

R. Solamente estoy reclamando por discrimen.

63. En su deposición, Guzmán indicó que basa su reclamación de alegado discrimen por impedimento en que "no se evaluó justamente" su solicitud de acomodo razonable y que no se evaluaron justamente sus condiciones médicas.

64. El demandante desconoce cómo Pespsi evaluó su solicitud de acomodo razonable.

65. El demandante alega, además, que Pepsi, al evaluar y denegarle su solicitud de acomodo razonable, infringió los Artículos 10, 11 y 12 del Convenio Colectivo.

66. El Artículo 10 del Convenio Colectivo vigente dispone:

Sección 1. Definición

La antigüedad de un empleado se define como la fecha en que el empleado comenzó a trabajar en la Compañía en una posición de unidad apropiada.

Sección 2. Derechos de Antigüedad y Pérdida de Empleo

   a. Renuncia voluntaria

   b. Despido

   c. Cesantía por más de un año

   d. No se presenta luego de ser llamado de vuelta al trabajo después de cinco (5) de haber recibido la carta para volver al trabajo en los casos de cesantía. Dicha carta debe ser enviada a la última dirección informada por el empleado a la Compañía. Será responsabilidad del empleado informar cualquier cambio de dirección.

e. Si el empleado está afuera del trabajo por razón en exceso de quince (15) meses, por el tiempo de la antigüedad o hasta que el empleado llegue al máximo mejoramiento médico (MMM), el que ocurra primero. Sin un empleado regresa a trabajar por menos de treinta (30) días laborales, el periodo de tiempo se remontará al día original en que el empleado estuvo fuera del trabajo.

f. El no presentarse a trabajar dentro de los quince (15) días de haber sido dado de alta por el Fondo de Seguros del Estado, SINOT, ACAA, siempre y cuando el empleado haya sido dado de alta en los términos aludidos en el párrafo (e) de esta Sección.

g. El no presentarse a trabajar después de la fecha límite de cualquier licencia otorgada por la Compañía excepto en caso de force majeur.

Sección 3. Cesantía.

El principio de antigüedad será considerado en caso de cesantías. Si la Compañía reduce el número de Merchandiser dentro de la División. El Merchandiser afectado por dicho reemplazo será cesanteado. Si no hay Merchandisers a tiempo parcial para ser reemplazados, el Merchandiser a tiempo completo será cesanteado. Dicho empleado debe solicitar el reemplazo por escrito a la Oficina de Recursos Humanos dentro de los cinco (5) primero días laborales luego de recibida la carta oficial de cesantía por parte de la Compañía.

En caso de que la fuerza laboral necesite ser aumentada nuevamente, se llamará de vuelta a los empleados en el mismo orden que fueran cesanteados siempre y cuando no haya pasado un (1) año de la cesantía de cada empleado.

La Compañía notificará a los empleados sobre llamarlos a trabajar de vuelta mediante correo certificado a la última dirección del empleado que aparezca en su expediente. El empleado tendrá cinco (5) días para reportarse a trabajar. Será responsabilidad del empleado informar a la Compañía cualquier cambio en su dirección.

Sección 4.

El derecho de antigüedad también aplicará para otorgar vacaciones, cesantías en su División y llamar de vuelta al trabajo. La antigüedad no aplicará a ningún tipo particular de trabajo dentro de una clasificación o el lugar donde el trabajo debe ser realizado, o el tipo de equipo con que dicho trabajo se ha de realizar.

Sección 5. Lista de Antigüedad

La Compañía preparará una lista de antigüedad indicando las fechas en que el empleado comenzó en la Compañía y el tiempo en la clasificación actual. Se enviará una copia de dicha lista a la Unión dentro de los primeros cuarenta y cinco (45) días luego de firmado el convenio colectivo. Si la Unión quiere copia de las subsiguientes listas de antigüedad, deberá hacer una solicitud por escrito a la Compañía. Se limita dicha solicitud de la Unión a una cada tres (3) meses. La Unión tendrá treinta (30) días para notificar a la Compañía de cualquier error que ellos entiendan exista en dicha lista. Si no notifica ningún error, la información en dicha lista se considerará como correcta y final.

67. El Artículo 11 del Convenio Colectivo vigente dispone:

VACANTES

Sección 1. Procedimiento para llenar vacantes o nuevas posiciones.

Las vacantes y/o nuevas posiciones se llenarán partiendo del principio de antigüedad. Se recurrirá al siguiente orden para llenar la vacante o la nueva posición:

   a. "Merchandiser a tiempo completo" de la División a tiempo completo cuando exista la vacante.

   b. "Merchandiser a tiempo parcial" de la División donde exista la vacante.

   c. "Merchandiser" de otra Division siguiendo el orden a continuación: (1) empleado a tiempo completo y (2) empleado a tiempo parcial.

    d. Personal fuera de la Unidad Apropiada escogido a discreción de la Compañía.

Sección 2. Convocatoria.

En caso de una vacante y/o una nueva posición, la Compañía notificará públicamente la vacante o la nueva posición durante cinco (5) días en las instalaciones donde trabajan los empleados de la unidad apropiada. Si algún empleado está interesado en la vacante y/o la nueva posición, el empleado debe firmar la convocatoria durante el periodo de convocatoria. Los empleados a quienes se les otorgue la posición mediante proceso de convocatoria deben permanecer en dicha posición por un periodo de seis (6) meses antes de solicitar en otra vacante y/o nueva posición. El posteo deberá tener el nombre de la posición vacante, la división donde existe la vacante y el área geográfica general en la cual la posición dará servicio regularmente. La Compañía también proveerá al delegado una lista actualizada de empleados con sus números de teléfono. El delegado contactará a los empleados para notificarles acerca de la vacante.

Se puede asignar a los merchandisers una cuenta dentro de un área geográfica general. Se definirá el área geográfica general como el territorio que funciona dentro de los límites de una división: Sabana Grande, Villa Prades, Toa Baja. Sin embargo, la Compañía intentará asignar las cuentas a los Merchandisers a tiempo completo tan cerca de su hogar como sea posible basado en antigüedad. Cualquier excepción será discutida con la Unión.

Sección 3. Promoción.

Cualquier empleado que sea promovido en la Compañía y salga de la unidad apropiada tendrá a su posición como "Merchandiser" reservada por un periodo de diez (10) días laborables. Si durante ese periodo el empleado decide no ejercer la posición para la cual ha sido promovido, o si la Compañía determina que no cualifica para la posición, el empleado podrá volver a su posición de "Merchandiser" sin perder antigüedad o los beneficios adquiridos.

68. El Artículo 12 del Convenio Colectivo dispone:

SALUD Y SEGURIDAD

Sección 1. La Compañía y la Unión aceptan proteger a todos y cada uno de los empleados de todo accidente de trabajo mediante las reglas industriales de seguridad más estrictas.

Sección 2. Se requiere a todos los empleados el cumplir con las reglas y prácticas de seguridad establecidas por la Compañía según las leyes federales y de Puerto Rico aplicables. La Unión y la Compañía se comprometen a promover entre sus empleados el entendimiento de la responsabilidad de los empleados en la prevención de accidentes y prácticas peligrosas.

Sección 3. Mediante este Convenio, se constituye un Comité de Salud y Seguridad con representantes de la Compañía. La representación de la Unión se constituirá con un trabajador de cada división.

Sección 4. La Compañía acepta pagar el tiempo que los miembros del Comité que participen en sus funciones oficiales.

Sección 5. El Comité debe recibir adiestramiento sobre diferentes temas relacionados con la salud y seguridad, en particular sobre cómo prevenir ciertos riesgos específicos en la Compañía (fuego, accidentes industriales, etc.). La Compañía planificará junto a la Unión dicho adiestramiento.

Sección 6. El Comité puede inspeccionar cualquier área de riesgo potencial, así como realizar pruebas que entienda necesarias.

Sección 7. Todos los empleados recibirán un (1) par de zapatos de seguridad por año.

69. El demandante reconoció en su deposición que, sobre las alegadas violaciones a los Artículos 10, 11 y 12 del Convenio Colectivo, no presentó queja o querella bajo el procedimiento de quejas y arbitraje, según requerido por el Convenio Colectivo vigente.

70. El demandante reconoció en su deposición que ninguno de los Artículos mencionados por este en su deposición hace referencia o está relacionado a acomodo razonable o proceso de evaluación de acomodo razonable por un impedimento.

**A. Despido injustificado**

Por otra parte, en cuanto a la causa de acción sobre despido injustificado en el caso ante nos, precisa señalar que, el foro a *quo* encontró probado que el apelante no reclamó que su despido fue

injustificado. *Véase* Determinaciones de Hechos 62, Entrada 58 SUMAC. Además, se probó que el foro primario carecía de jurisdicción para atender el asunto de despido injustificado debido a que el apelante era un empleado unionado a quien le aplicaba un Convenio Colectivo donde se pactó que el foro arbitral sería el ente con jurisdicción para atender este asunto. *Véase* Determinación de Hechos 5 y 7; Entrada 58 SUMAC. Por otro lado, el apelante tenía conocimiento del procedimiento de arbitraje dispuesto por el Convenio Colectivo para los asuntos de despido injustificado. *Véase* Determinación de Hechos 6; Entrada 58 SUMAC.

En lo pertinente, el Convenio Colectivo es "el acuerdo por escrito entre una organización obrera y un patrono en que se especifican los términos y las condiciones de empleo para los trabajadores cubiertos por el contrato, el estatus de la organización obrera y el procedimiento para resolver las disputas que surjan durante la vigencia del contrato". *Felipe Landrau Cabezudo v. Autoridad de los Puertos de Puerto Rico*, 2025 TSPR 7, pág. 45. Ciertamente, el Convenio es un contrato y vincula por igual al patrono, a la Unión y a los miembros individuales, estando estos obligados a cumplir rigurosamente con lo que ahí estipularon. *Íd* (énfasis nuestro). De igual forma, acentuamos que el Convenio Colectivo tiene fuerza de ley entre las partes, siempre y cuando sus cláusulas no contravengan las leyes, la moral u orden público. *Íd.*, págs. 45-46.

Debemos reiterar que el Convenio Colectivo del caso de marras establecía que cualquier medida respecto a acciones disciplinarias tomadas por la compañía contra cualquier empleado, los procesos para resolverla debían regirse por el procedimiento dispuesto en el Convenio Colectivo. *Véase* Anejo 5, págs. 15-16; Entrada 47 SUMAC. Por tanto, dichas reclamaciones debían hacerse mediante procesos de arbitraje. *Véase* Determinación de Hechos 7,

Entrada 58 SUMAC; Convenio Colectivo, págs. 15-16. Es hartamente conocido que en nuestra jurisdicción es favorecido el procedimiento de arbitraje como mecanismo alterno para resolver disputas obrero-patronales. *Felipe Landrau Cabezudo v. Autoridad de los Puertos de Puerto Rico, supra*, pág. 34. Por otra parte, nuestro Más Alto Foro ha dispuesto que, cuando los contratantes se obligan a utilizar el arbitraje como método para resolver las controversias, "se crea un foro sustituto a los tribunales de justicia, cuya interpretación merece gran deferencia". *Depto. Educ. v. Díaz Maldonado*, 183 DPR 315, 325 (2011), citando a *CFSE v. Unión de Médicos*, 170 DPR 443, 449 (2007). Pactado en un contrato que toda controversia o reclamación que surja de su interpretación o que esté relacionada con el contrato sería resuelta por arbitraje, los tribunales recurren a la referida política en favor del arbitraje. *PaineWebber, Inc. v. Soc. de Gananciales*, 151 DPR 307, 312 (2000).

Así, pues, en tales casos, mediante este método alterno de solución de disputas, las partes voluntariamente sustituyen a los tribunales por un árbitro que determine todas las cuestiones de hecho y de derecho habidas entre ella. *Felipe Landrau Cabezudo v. Autoridad de los Puertos de Puerto Rico, supra,* pág. 34. En el presente caso, el apelante no agotó los remedios dispuestos en el Convenio Colectivo para dirimir la controversia. Es evidente, pues, que, el Convenio Colectivo establecía que se debía presentar toda controversia o disputa entre empleados, unionados y patrono ante el Negociado de Conciliación y Arbitraje del Departamento del Trabajo. En vista de ello, el foro primario no tenía jurisdicción para atender la controversia de despido injustificado.

### B. Acomodo razonable

Según las determinaciones de hechos número 61 a la 65, la causa de acción de la parte apelante consistía en el incumplimiento de la parte apelada al denegarle injustificadamente su solicitud de

acomodo razonable. Ahora bien, conforme consignado por el tribunal apelado en las determinaciones de hecho 50 hasta la 55 la propia parte apelante admitió que, aún concedido el acomodo razonable no estaba físicamente apto para regresar a sus funciones de *Merchandiser*.

Conforme surge del expediente médico de la parte apelante, el neurocirujano de la parte apelante indicó que, el apelante no podía levantar pesos superiores a 10 libras desde octubre de 2020. Agregue que, el apelante reconoció en su deposición que "no tenía fuerza para sacar mercancía de las cajas en su trabajo". El apelante también admitió que, independiente al número de cajas no tenía fuerzas en las manos para manejar la mercancía. Además, admitió no poder conducir y estar limitado para levantar cosas, agacharse, doblarse, estar de pie, alcanzar, caminar, sentarse, arrodillarse, subir/bajar escaleras, completar tareas, concentrarse, seguir instrucciones, el uso de las manos.

Del análisis realizado por la parte apelada surgió que, al menos 2 *merchandisers* se verían impactados significativamente de concederse el acomodo solicitado por el apelante. El acomodo solicitado conllevaba que otros *merchandisers*, además de atender a los clientes en sus respectivas rutas, tuvieran que cubrir los clientes de mayor volumen de la ruta original del apelante. Esto, pues, los clientes que el apelante deseaba que le removieran eran los de mayor volumen. Además, la creación de la ruta solicitada por el apelante conllevaba que este tuviera que visitar más clientes diariamente. Esto requería más tiempo conduciendo y sentado, actividades para las cuales el propio apelante admitió estar impedido de completar. Por tanto, el acomodo solicitado también hubiera sido oneroso para el apelante conforme a sus propias admisiones y evidencia médica contenida en su récord de paciente. Tampoco existían otros puestos o vacantes para los cuales el apelante cualificara, y conforme a la

determinación de hecho número 72 el apelante tampoco solicitó otro puesto. Agregue, que, según las determinaciones de hechos número 36 a la 41 las operaciones de la parte apelada quedarían seriamente afectadas de haberse concedido el acomodo solicitado por el apelante.

La obligación del patrono de proveer acomodo razonable no significa proveer la mejor alternativa posible si existen diversas formas de proveer un acomodo al empleado o si existen otras alternativas disponibles. Acevedo Colom, *op. cit.*, pág. 273. A modo de excepción, un patrono no tendrá la obligación de conceder un acomodo razonable bajo la Ley ADA ni la Ley Núm. 44-1985 si representa un esfuerzo extremadamente oneroso. 42 U.S.C. sec. 12111 (10)(A); 1 LPRA sec. 507a. Conforme a los hechos incontrovertidos, la concesión del acomodo hubiera resultado en una carga mayor de trabajo para el resto de los *Merchandisers* de la parte apelada. Inclusive resultaría una carga onerosa para el propio apelante al requerir más tiempo como conductor. Acción, que, según el historial médico del apelante, agravaría sustancialmente sus padecimientos de salud.

El apelante no presentó suficiente evidencia que demostrara lo siguiente: (a) que es una persona incapacitada según definido en la Ley ADA o la Ley Núm. 44; (b) que podía llevar a cabo las funciones esenciales de su puesto con o sin acomodo razonable; y (c) que, aun conociendo el patrono de la incapacidad de la parte demandante, éste no hizo un esfuerzo razonable para proveer el acomodo solicitado. *EEOC v. Kohl´s Dept. Stores, Inc., supra*; *Freadman v. Metro. Prop. and Cas. Inc. Co., supra*.

En cambio, la parte apelada logró establecer su derecho con claridad y demostró que, no existe controversia sustancial o real en cuanto a la imposibilidad del acomodo razonable solicitado por la parte apelante. *Mun. de Añasco v. ASES et al.*, 188 DPR 307, 326

(2013). Un acomodo razonable consiste en "el ajuste lógico, adecuado o razonable que permite o faculta a una persona cualificada para el trabajo, con limitaciones físicas, mentales o sensoriales ejecutar o desempeñar las labores asignadas a una descripción o definición ocupacional". 1 LPRA sec. 501 (b). Como vimos, la parte apelante admitió no poder cumplir con los requerimientos del puesto de *merchandiser* inclusive con las modificaciones de ruta, clientes, carga y trabajo que solicitó.

La Regla 36.1 de Procedimiento Civil autoriza a los tribunales a dictar sentencia de forma sumaria si mediante declaraciones juradas u otro tipo de prueba se demuestra la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. 32 LPRA Ap. V, R. 36.1. En el presente caso, al examinar el cúmulo de prueba presentada por la parte apelada junto a su moción de sentencia sumaria, solo procedía dictar sentencia sumaria a su favor porque surge de manera clara que, ante los hechos materiales no controvertidos, la parte apelante no puede prevalecer ante el derecho aplicable. *Meléndez González et al. v. M. Cuebas*, *supra*, págs.109-110. Por ello, el tribunal desestimó la demanda presentada por el apelante.

### -IV-

Por los fundamentos antes expuestos, que hacemos formar parte de este dictamen, *confirmamos* la sentencia sumaria apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones